**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**J. L. HULL, Defendant-Appellant.
No. 17531.**

United States Court of Appeals,
Seventh Circuit.

April 15, 1971.

James V. McGlone, Stuart, Branigin, Ricks & Schilling, Lafayette, Ind., for defendant-appellant.

Herbert Beigel, Chicago, Ill., William C. Lee, U. S. Atty., Fort Wayne, Ind.,

for plaintiff-appellee; Jeffrey Cole, Asst. U. S. Atty., of counsel.

Before SWYGERT, Chief Judge, and CUMMINGS and KERNER, Circuit Judges.

KERNER, Circuit Judge.

This is an appeal from the jury conviction of defendant-appellant, J. L. Hull, for second degree murder, a federal crime under 18 U.S.C. §§ 1114 and 1111, since the victim was an agent for the Bureau of Narcotics of the United States Treasury Department. Hull was tried with his half-brother, B. Ellis Robinson, who pled guilty during the trial and is not involved in this appeal.

Defendant's major contention for reversal concerns the legality of his pre-indictment custody and interrogation by federal agents and Indiana police, which began at midnight on December 20, 1967, and ended when he was brought before a United States Commissioner for arraignment at 3:00 o'clock the following afternoon. A pre-trial suppression hearing was held, and the district court judge ruled that the evidence of defendant's confession, elicited from the interrogation, and other evidence discovered as a result of the confession would be admissible at trial.

Specifically the defendant claims that his confession was involuntary and consequently inadmissible at trial.

We must decide whether Hull's confession, in light of all the facts and circumstances surrounding the December 20 custodial interrogation, was the product of his free choice, Lynumn v. Illinois, 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963); Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961). If he confessed because his will was overborne by the interrogation and if he would have remained silent but for the improper influences on him, then we must hold his confession involuntary. Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897). Admittedly, this determination is a difficult one since it involves a consideration of both the propriety of the officers' conduct and its psychological effect on the mind and will of the accused. Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963).

In order to evaluate fully the effect of the custodial interrogation on the defendant, we must consider these facts: J. L. Hull is a 34 year old Negro who is mentally defective. His full-scale I. Q. is 54, and he has the mental age of an eight or nine year old child. He completed the third grade in school and is illiterate. Psychiatric experts termed him passive and easily led by a more dominant personality. Hull can follow instructions if they are repeated or paraphrased for him several times; otherwise he has a tendency to lose his attention and comprehension.

With this in mind, we turn to the events of December 19 and 20, 1967. On the evening of December 19, federal narcotics agents, Robert Bottorff and Mansel Burrell, were investigating Hull's half-brother, Robinson, for a possible narcotics violation. Burrell, the deceased, was acting as an undercover agent and had arranged an appointment with Robinson for a buy of narcotics. Before the contact was made that evening, Bottorff recorded the numbers of the currency Burrell was to use for the buy.

At 8:30 p. m., Bottorff, accompanied by another federal agent and two Gary, Indiana, policemen, observed Burrell enter Robinson's apartment. At 9:15 p. m., Burrell was seen leaving the apartment building, followed by Robinson and an unidentified man. Burrell started his government car, and the two other men entered a Pontiac automobile. Bottorff followed the Pontiac and noticed Burrell closely behind him, but lost both cars in traffic. Fifteen minutes later, Bottorff found Burrell's car parked in the alley near Robinson's apartment.

After surveilling Burrell's car for nearly two hours, Bottorff's companions returned to Gary Police Headquarters. At 11:30 p. m., Bottorff, observing Hull enter and start Burrell's car, pursued

him and managed to stop him within a few blocks. Hull got out of Burrell's car and was moving away from the scene. Bottorff, believing the defendant to be in possession of a government car without authorization, identified himself and ordered him to stop at the point of a gun.

While Bottorff was searching him, Hull lunged for the gun and Bottorff hit him in the face and subdued him. Hull's face was bleeding. Bottorff continued the search and removed from Hull's pocket currency wrapped in a handkerchief. There were red stains on the money, and some of the numbers on the currency matched those which Bottorff had recorded from Burrell.

At 12:00 o'clock midnight Hull was booked at headquarters and taken to an interrogation room where Bottorff and three others were waiting for him. Bottorff's version of the interrogation is that within a few minutes Hull confessed that he saw Robinson shoot Burrell two to four times in the head and helped Robinson dump the body somewhere in Illinois. Bottorff testified that he read Hull his *Miranda* warnings and Hull then confessed, stating that he "just want[ed] to get it off [his] * * * chest." The district court found Bottorff's testimony lacking in credibility and believed that Hull did not confess to Bottorff and, in fact, constantly denied his guilt for many hours after Bottorff's questioning.

The district court's finding that Bottorff did not receive a confession from Hull before 12:30 a. m., is buttressed by the fact that Hull was continually confronted with questions from relays of interrogators and he adamantly denied involvement with Burrell. Many of the officers did not know as late as 3:00 a. m., that anything unusual had happened to Burrell. If Bottorff elicited an early confession from Hull, he would not have then embarked on the rudimentary investigation he subsequently conducted. It was not until 3:00 a. m., when the officers found a large quantity of blood in the trunk of the Pontiac which Bottoroff had followed earlier in the eve-

ning, that many suspected that there was foul play involved.

Meanwhile, the questioning of Hull continued. Many testified that officers individually and in teams questioned Hull during the night and through the following morning. There was a great deal of shuffling in and out of the interrogation room. Officer George Lowe, who questioned Hull alone and with another officer said that the questioning was vigorous and that Hull was upset. After 3:00 a. m., Hull was confronted by Officer James Hilton with the evidence of the blood. Hull continued in his denials and shrugged his shoulders.

Agents Carroll Gibson and Kenneth Rhodes, who extracted a statement from Hull, arrived at headquarters at 3:00 a. m. At 4:30 a. m., they began their questioning; other officers were present. Prior to questioning, Gibson advised Hull of his constitutional rights. Five minutes later, Hull signed a waiver of rights form.

At trial, Gibson told of the subsequent interrogation:

I remember when I first started questioning him, I was asking him about the car, and he would—he was telling me that he was in—well, he would sell parts off of cars and somebody told him that there was a car, and if he wanted the tires off of it, he could get the tires off of the car and sell them; and in doing this, I banged on the table and I told him, "I don't want to hear that because I don't believe that."

He was just going to steal—take a car because somebody told me and then he would tell me that he is telling the truth, and I jumped up and pushed the chair and said, "I don't want to hear that. I want the truth, because you are wasting time. I want to find the boy."

Then, he told me another story * * and we went through that and by the time that I was standing there—I was standing up and I said—I probably got up and pushed the chair, and I remem-

ber on one occasion we got to discussing the fact about he heard a rumor where the body might be, and I was asking him if he did—did he know, and he turned around and he pounded on the wall and told me, "I don't know, I don't know," and we had quite a lot of confusion in the room at the time.

A number of officers testified that Hull was crying during the questioning. Gibson stated that Hull was "very emotionally upset * * *" and "very nervous."

The interrogation leading up to the confession continued. Gibson stated that he told Hull:

That I was not too interested in what had occurred, but I was interested in finding Burrell, because I was very concerned about his well being, and I had tried to explain to him the importance of him telling me where Burrell was, because if he was hurt, I wanted to get him in time to get him to a doctor.

I further explained to him, also, that I wasn't too concerned what had taken place, but if Burrell was hurt, and he was involved, and if I could get to him in time, the best that we might have on our hands is an assault rather than anything serious.

And then, he explained to me what he said that took place, and we went on, and I further stated that in—more or less pleading and begging him to— if he could recall, to tell me where I could find Burrell, and then, he discussed in his version what had taken place, and I also asked him if he didn't have anything to do with it, perhaps, he has heard something on the street being in a position where he knew people and, you know, knew what was going on, that could assist me in finding Burrell, because I was really concerned about Burrell, because he was a personal friend of mine.

Within a half hour, Hull told the officers that he saw Robinson shoot Burrell and helped him dispose of the body in Illinois. Hull thought Burrell was dead because he had been shot in the head. Gibson told him that he knew of someone who had been shot in the head and lived, and that, if something is done soon, we might "get this boy to a doctor and save him."

Hull agreed to direct the officers to Burrell's body. During the car trip to the site, Hull seemed "very remorseful" to Agent Rhodes. Another agent noticed Hull crying in the car. At 7:55 a. m., the body was found. After leaving the scene at 9:00 a. m., Hull was crying again, but agreed to show the officers the location of the shooting. While in the car, Hull was again advised of his constitutional rights.

Hull and the officers returned to headquarters and sometime after 10:00 a. m., a witness testified, Hull "looked tired and sleepy."

By noon, a complete written statement had been dictated, prepared and signed by Hull. At 3:00 p. m., Hull was taken before the United States Commissioner.

Hull testified that he was beaten intermittently by different officers throughout the night. One witness, who was in the hallway outside the interrogation room that night, believed that Hull was beaten because of the noises and groans he heard coming from the room. This witness, along with Doretha Hudson, who had also been sitting outside the interrogation room, stated that they saw an officer wearing a black glove enter the room. Miss Hudson was moved to another spot when her identity was discovered by the officers.

Each testifying officer denied that any physical violence was used on Hull. Most of the officers said that there was no one wearing a black glove in the interrogation room. Hilton and Rhodes did not recall whether anyone was wearing a black glove.

A number of witnesses who saw Hull after the interrogation stated that his face was badly bruised. Bottorff stated that Hull's face had been bruised as a result of the scuffle at the time of the arrest. All the other officers who no-

ticed Hull's face testified that it was not bruised. The district court, after considering this testimony, and viewing photographs of Hull taken before and after the interrogation, found that he was not beaten except by Bottorff at arrest.

■ Viewing the totality of the circumstances of Hull's interrogation and custody, we hold that his confession was involuntary and inadmissible.[1] We cannot believe that his statements to the officers were the product of "a rational intellect and a free will." Lynumn v. Illinois, 372 U.S. 528, 534, 83 S.Ct. 917, 920, 9 L.Ed.2d 922 (1963). Not only was Hull mentally and emotionally handicapped to begin with, but he was subjected to a continuous series of intensive interrogations for nearly twelve hours. Until near 5:00 a. m., he consistently denied his involvement in any crime during aggressive confrontations with different officers. The officers played on his emotions, and he was ill-equipped to combat "the diverse pressures which sap or sustain his powers of resistance and self-control." Culombe v. Connecticut, 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961).

Mental or emotional instability, low intelligence and immaturity have been recognized as important factors in determining the voluntariness of confessions. Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959); Clewis v. Texas, 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967); Davis v. North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966); Reck v. Pate, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed. 2d 948 (1961). See United States v. De

La Cruz, 420 F.2d 1093 (7th Cir. 1970). Such handicapped people can become "easy victims" of the pressures normally inherent in custodial interrogations. Haley v. Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948). See Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The defendant here has been shown to possess a short attention span and a suggestible nature. He has the mental age of an eight or nine year old; he is illiterate. During the interrogation, he consistently denied his guilt. Yet, he was continuously confronted with new evidence and with questions from relays of officers from 12:00 midnight till he signed the written confession before noon. Haley v. Ohio, supra; Davis v. North Carolina, supra; Spano v. New York, supra. Not only was the questioning lengthy, but it was pressured. The evidence indicates that the defendant was crying and moaning at various times. He could not have reacted to the situation in a sensible or rational manner.

Discarding the evidence relating to physical violence, it is uncontroverted that some officers contributed to the confusion of the interrogations by yelling and pounding on the table. Hull's normally weak powers of resistance were threatened by the officers. In a session with Hull, Agent Gibson was at first aggressive and demanded straight answers. Then, when Hull was crying and upset, Gibson played on his sympathies and told him that he might be able to get off with an assault charge. Subtle pressures by law enforcement officers, such as resort to sympathy and promises of a lighter charge, have been held to contribute to involuntariness. Davis v. North Carolina, supra; Spano v. New York, supra.

1. We find inapposite the recent United States Supreme Court decision of Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971) which held that an unconstitutionally extracted confession is admissible to impeach the testimony of the defendant at trial. See footnote 2 of the opinion. In the case at bar, the defendant's incriminatory statements at headquarters, in the police car after 5:00 a. m., and at the sites of the body and shooting, as well as evidence subsequently discovered as a result of these confessions were introduced by the government as independent evidence of guilt. A substantial portion of this evidence was introduced by the government before the defendant took the stand.

Although Hull gave a confession before 5:00 a. m., a great deal of self-incriminating evidence was discovered from statements Hull made in transit to the sites of the body and the shooting, and from the final written confession, signed before noon. During all this time, Hull remained upset and became more fatigued by the prolonged questioning. He had no sleep or food, except for a cup of coffee. His face was bruised, and he received no medical attention. Lack of food, sleep and medication add to the evidence of involuntariness. Greenwald v. Wisconsin, 390 U.S. 519, 88 S.Ct. 1152, 20 L.Ed.2d 77 (1968); Spano v. New York, *supra.*

The government asserts that the defendant's privilege against self-incrimination should be balanced against the officers' sincere attempts to save Burrell's life. We agree that the officers should have used every effort within the law to locate and save Burrell. Yet, we cannot engraft an exception to the Fifth Amendment's privilege against self-incrimination in cases involving missing persons. The cases under the Fifth Amendment do not indulge in such balancing. A statement which is adjudged to be involuntary can be no less compelled in one type of case than in another.

The defendant also contends in this appeal that his arrest by Officer Bottorff was illegal. We disagree. At the time that Bottorff stopped Hull as he was walking away from Burrell's car, he had probable cause to believe that Hull was driving a government automobile without authorization from Burrell; he could also have believed that some harm had been done to Burrell. On these facts, it was reasonable for Bottorff to place Hull under arrest. Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L. Ed.2d 327 (1959). Bottorff's suspicion of some foul play involving Burrell and his car could have been heightened by the fact that he had been unable to locate Burrell for over two hours.

As to the testimony of Evelyn Davis that Hull was involved in a sale of narcotics earlier in the evening on December 19, we hold that it is admissible to prove intent and a course of conduct which connects Hull with Robinson and Burrell. This testimony would substantiate evidence of Hull's involvement in the scheduled sale of narcotics between Robinson and Burrell, and would connect him with Burrell prior to 11:30 p. m., when he was seen in Burrell's car. Although the Davis testimony may concern evidence of another crime, it is nevertheless admissible "when it is so blended or connected with the one on trial that proof of one incidentally involves the other." United States v. Hoskins, 406 F.2d 72, 75 (7th Cir. 1969).

Accordingly, we reverse the conviction and remand for a new trial.

Reversed and remanded.