COMMONWEALTH *vs.* DELMONT F. DAVIS.

Middlesex. November 6, 1979. — March 4, 1980.

Present: HENNESSEY, C.J., QUIRICO, KAPLAN, WILKINS, & ABRAMS, JJ.

*Homicide. Constitutional Law,* Admissions and confessions, Assistance of counsel, Waiver of constitutional rights, Ex post facto law. *Waiver. Practice, Criminal,* Mistrial, Capital case. *Identification. Witness,* Impeachment.

Evidence at a hearing on a motion to suppress statements made by a defendant warranted findings that the defendant's waiver of his Miranda rights was knowing and his statements voluntary despite the defendant's limited education and intellectual ability. [3-7]

Evidence on a motion to suppress lineup identifications warranted findings that the defendant had knowingly and voluntarily waived his right to have counsel present and that the lineup was not unduly suggestive. [8-10]

At a murder trial, the judge did not err in excluding questions on cross-examination of a witness about whether he had a valid permit for his gun and about a prior arrest. [10-11]

At a murder trial, the judge did not err in denying the defendant's motion for a mistrial when a prosecution witness who had testified briefly on the seventeenth day of trial became ill and was unable to complete his direct testimony or to stand cross-examination. [11-12]

Special review under G. L. c. 278, § 33E, was available where an offense resulting in a second degree murder conviction upon an indictment in the first degree was committed before July 1, 1979. [12-17]

INDICTMENTS found and returned in the Superior Court on May 14, 1974.

Pretrial motions to suppress evidence were heard by *Ronan, J.*, and the cases were tried before *Adams, J.*

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*John C. McBride* for the defendant.

*Robert M. Raciti*, Assistant District Attorney, for the Commonwealth.

KAPLAN, J. About 8 P.M., March 20, 1974, the defendant entered Sam's Variety Store on Salem Street in Medford. Present were Nathan Cohen, the proprietor, and Marie Morelli, a customer. The defendant, armed, said, "This is a holdup, I want all the money." Instantly Cohen took a revolver from under the counter, behind which he was standing, and fired. The defendant returned the fire, then fled, shattering the glass of the front door.[1] In the exchange, Morelli had been shot in the head. She was pronounced dead at 9:40 that evening. The bullet that struck Morelli was not recovered. But sufficient evidence was introduced at trial to warrant the jury in concluding that it was the defendant who fired the fatal shot.[2]

On April 9, 1974, in a two and a half hour meeting with Medford police and others, the defendant admitted he was the robber. This interview occurred in the Auburn County jail in Lewiston, Maine, where the defendant was being held on unrelated charges. On being brought back to Medford the following day, the defendant participated in a lineup and was identified by Cohen and another witness. He spoke again with the police on May 5, 1974, again mak-

---

[1] Cohen fired a second shot from the doorway of the store as the defendant escaped.

[2] The defendant was using a .32 caliber automatic pistol, Cohen a .38 caliber revolver. A pathologist who testified for the Commonwealth stated that the size of the victim's entrance wound was consistent with a .32 caliber bullet but not with a .38 caliber bullet. According to the pathologist for the defense, no such conclusion could be reached. Blood was found on the counter suggesting that the crucial shot was fired by the defendant, as both he and the victim were positioned in front of the counter, with Cohen behind it. (See note 10, *infra.*)

ing inculpatory statements, and on May 9 he testified before a grand jury, describing his involvement in the holdup. Subsequently he was indicted for murder (comprehending murder in the first degree), assault with a dangerous weapon with intent to murder, assault with a dangerous weapon with intent to rob, and use of a motor vehicle (the getaway car) without authority.

Before trial the defendant moved to suppress the three statements above mentioned as well as evidence of the line-up identifications. The motion was denied on June 27, 1975. At trial the defendant on December 13, 1975, was found guilty of murder in the second degree (the judge's instructions having also encompassed the first degree) and of the other offenses charged; he was sentenced to life imprisonment on the murder conviction with concurrent sentences of twelve to twenty years on the assaults, the motor use charge being filed by consent. He appealed under the provisions of G. L. c. 278, §§ 33A-33H. (Legislation of 1979 affecting those sections, particularly § 33E, will be discussed below.) He claims error in the denial of his motion to suppress and in the subsequent admission of the relevant evidence at trial. Other trial errors are alleged to which we shall also come.

1. *Pretrial waiver.* As will appear, on the three occasions on which the defendant made statements, he was advised of his constitutional rights and indicated that he understood and waived them and was willing to speak. The defendant's claim, however, is that, having limited intelligence, he never actually understood those rights, so that his waiver should be held ineffective as in essence involuntary, and the statements should be rendered inadmissible accordingly.

The Commonwealth bears the burden of demonstrating that the defendant waived his rights "voluntarily, knowingly and intelligently" (*Miranda* v. *Arizona,* 384 U.S. 436, 444 [1966]; see *Commonwealth* v. *Hosey,* 368 Mass. 571, 574 [1975]), every reasonable presumption being indulged against a waiver. See *Commonwealth* v. *Hooks,* 375 Mass.

284, 288 (1978), *Johnson* v. *Zerbst,* 304 U.S. 458, 464 (1938). We are to consider "the totality of all the surrounding circumstances — both the characteristics of the accused and the details of the interrogation" — in reaching a judgment. *Commonwealth* v. *Daniels,* 366 Mass. 601, 606 (1975), quoting from *Schneckloth* v. *Bustamonte,* 412 U.S. 218, 226 (1973). In the present case we are assisted by the detailed findings of the motion judge after nine days and 1,314 transcript pages of hearings (unnecessarily extended by futilely repetitious interrogation by defense counsel). We accept the judge's subsidiary findings as well supported; his conclusions are entitled to respect, but they do not bind us and we submit them to our independent judgment. See *Commonwealth* v. *Murphy,* 362 Mass. 542, 550-551 (1972) (concurring opinion of Hennessey, J.); *Commonwealth* v. *Jones,* 375 Mass. 349, 354 (1978).[3]

(a) *Statement of April 9, 1974.* The defendant was then thirty years old. He had an I.Q. of seventy-nine. The normal range is between ninety and 109. Although he had attended school to the eighth grade, he was illiterate, but was able to write his name. All this is agreed.[4]

Medford police Lieutenant John Keating and his partner, Sergeant Patrick Carr, the principal questioners of the defendant, first encountered him at the Auburn jail about 6 P.M. that day. Keating said he had a warrant for the defendant's arrest for the murder on March 20 of Marie Morelli. Next, Keating read the defendant the Miranda rights from a printed card and asked if he understood them. The defendant said as to each right that he did. He answered affirmatively to the question whether he wanted to talk to the officers. Keating asked the defendant to read and sign

---

[3] The trial judge left to the jury the voluntariness not only of the defendant's statements, but also of the waiver of his right to remain silent. See, however, *Commonwealth* v. *Chung,* 378 Mass. 451, 458 n.9.

[4] A psychologist testified for the defendant about the defendant's intelligence as measured by standard tests. The "retarded" category is not reached until I.Q. 69.

the Miranda card; when the defendant indicated he could not read, Keating read from the card again, and the defendant then signed it and said he wanted to talk about the holdup at Sam's to "get this thing off my chest."

In response to questions, the defendant recounted the episode of March 20. He told how he and three other men (Michael Barrett, Kenneth Larkin, and William Paskell) decided to rob Sam's store. The defendant was the one who entered the store and announced the holdup. He did not draw and fire his gun until Cohen had fired at him. He thought he had not struck Morelli because he heard his shot hit the cans behind the counter. He remembered seeing Morelli standing as he left the store.[5] He told also of his flight to Maine.

The interview was taped; in addition, the police wrote down the answers to the questions and read them back to the defendant to ensure accuracy. At the close of the interview, the written responses were read to the defendant again, and he signed each page on which they appeared.[6] Testifying at the suppression hearing, the defendant himself said that he was told three or four times during the session that he could stop the questioning at will; he also acknowledged that he had put questions to Keating about his consti-

---

[5] On April 10 the defendant sought out Keating and told him that, contrary to what he had said the day before, he had not seen the victim standing when he left the store.

[6] At the close of the interrogation the defendant answered affirmatively three additional questions:

> 1) "Delmont did you rob Sam's Variety on March 20, 1974?"
> 2) "Did Kenny Larkin, Billy Paskell, and Mike Barrett help you rob Sam's Variety?"
> 3) "Did you shoot gun at store manager in Sam's Variety on March 20, 1974?"

Asked if he felt better after discussing the incident, the defendant said:

> "Yeah, I really do because it's been bugging me and everything, and I'd rather face it and get it over with, why live with it and hide for the rest of my life so you know, I feel a lot relaxed. I just hope it wasn't me that done it, it might have been me, but as far as I know that when I fired the gun it hit the cans."

tutional rights before answering the officers' questions.[7] Contrast *Commonwealth* v. *Daniels,* 366 Mass. 601, 608 (1975). There is no hint of the use of any of the techniques of interrogation criticized in the *Miranda* case. *Miranda* v. *Arizona, supra* at 445-448. Contrast *Reck* v. *Pate,* 367 U.S. 433, 441 (1961); *Ashcraft* v. *Tennessee,* 322 U.S. 143, 153 (1944); *United States* v. *Hull,* 441 F.2d 308, 313 (7th Cir. 1971).

The motion judge hearing the tapes described the interview as logical and orderly, free of hostility, coercion, or threats. Perhaps more significantly for the present purpose, he found the defendant's answers "responsive, clear, lucid, and ready. His voice was soft, calm, composed and void of any agitation or emotion. No remark or response of Davis . . . is found to be confused, incoherent; but rather his conversation is found intelligent and rational." Dr. William Shelton, a psychiatrist called to testify about the defendant's competency to stand trial, said under questioning by the judge that during his meeting with the defendant he found him communicative and possessed of a "reasonable degree of rational understanding." An effective waiver was not precluded by the defendant's limited education and intellectual ability. *Commonwealth* v. *Daniels, supra* at 606, and cases cited.[8] Compare *Blackburn* v. *Alabama,* 361 U.S. 199, 207 (1960); *United States* v. *Hull,* 441 F.2d 308, 309 (7th Cir. 1971). We note here that the defendant had had years of worldly experience, including several encounters with the law in which he had four or five times been given Miranda warnings. Undoubtedly he recognized the seriousness of his situation.

---

[7] The defendant at the hearing conceded that he understood his right to remain silent but claimed ignorance of the other Miranda rights.

[8] The whole tenor of the evidence was such that the Commonwealth's omission to introduce expert evidence on its own behalf (apart from testimony about competency to stand trial) raised no such questions as were discussed in *Commonwealth* v. *Kostka,* 370 Mass. 516, 539 (1976) (Hennessey, C.J., dissenting in part) (issue of insanity).

The motion judge, who had the benefit of seeing and hearing the defendant testify, concluded that the defendant's waiver was knowing and his statement voluntary. We agree.[9]

(b) *Statements of May 5 and May 9, 1974.* We skip for the moment the lineup of April 10, 1974. On May 5, Keating and Carr, in response to a telephone call from the defendant, visited him at the Plymouth County house of correction. A prison official told the defendant he was not obliged to speak to the officers but the defendant said he wanted to do so. At that point Miranda rights were carefully given and the defendant signed a Miranda card. The defendant said (without any prior suggestion) that he wanted to go before the grand jury because he believed he had not fired the effective bullet. He said he now remembered more of the incident and proceeded to amplify his April 9 statement with some details in themselves having a tendency to palliate his offense by linking Cohen to the fatal shot.[10]

On May 9, the defendant in fact appeared before a Middlesex County grand jury. The prosecutor gave the defendant Miranda warnings as he took the stand. Then the defendant told his story. The grand jury indicted.

Like the statement of April 9, the May statements were not coerced, but the question of the defendant's cognitive ability recurs and the judge's answer remained the same, as does ours. Indeed the defendant testified at the suppression hearing that counsel appointed by the court for him on April 11 had explained his rights to him that day, well before the May statements, so that he understood them well.[11]

---

[9] The judge denied suppression of the added statement of April 10 (see note 5, *supra*) as well as the statement of April 9.

[10] The defendant claimed to recall on May 5 that he found blood on his shoulder although he had not been shot. But compare note 2, *supra*. The clothing worn by the defendant on March 20 was discarded soon after the incident and was not recovered.

[11] The defendant does not argue in this court a question raised at the suppression hearing about the propriety of the police receiving the state-

(c) *Lineup.* Returning under arrest from Maine on the evening of April 10, the defendant was placed in a lineup at the Medford police station and was identified by Cohen and also by Frank Palmisano, the proprietor of a service station across the street from Sam's store.[12] The failure to suppress a photograph of the lineup and testimony of the identifications, and the admission of corresponding material at trial, are attacked, first, on the ground that the defendant could not waive intelligently a right to have counsel present of which he was advised just before the lineup took place. This is answered in the terms set out above; the defendant in fact signed a paper evidencing his consent. There is no need then to advance the proposition that the defendant's Sixth Amendment right to counsel had not attached under *Kirby* v. *Illinois,* 406 U.S. 682, 689 (1972), as "adversary judicial criminal proceedings" against the defendant are conceived not to have been initiated despite his having been arrested and booked. See *Flaherty* v. *Vinzant,* 386 F. Supp. 1170, 1172 (D. Mass. 1974).[13]

---

ment of May 5, and letting the defendant go before the grand jury on May 9, without their getting in touch with counsel for the defendant. See *Massiah* v. *United States,* 377 U.S. 201 (1964). It appears that counsel's assignment ended with the probable cause hearing on April 25; the defendant initiated the meeting of May 5 and chose deliberately not to attempt to reach that attorney; Miranda warnings were given about procuring counsel; and the May statements were not more inculpatory than the April 9 statement. We leave to another day the further exploration of the issues regarding notification of counsel discussed in *Brewer* v. *Williams,* 430 U.S. 387, 405-406 (1977), and *Commonwealth* v. *Frongillo,* 359 Mass. 132, 136-137 (1971) (see also *Commonwealth* v. *Williams,* 378 Mass. 217, 227 n.10 [1979]), and recently renewed by the New York Court of Appeals in *People* v. *Cunningham,* 49 N.Y.2d 203 (1980).

[12] The identifications, made separately by the two witnesses, were definite. Neither was told that a suspect had been arrested or a confession given.

[13] The defendant argues that he was willing to decline the Commonwealth's offer of counsel only because he had already made the incriminating statement of April 9 which, according to his claim, was illegally obtained. This "cat out of the bag" contention, such as it is, fails because the April 9 statement was secured lawfully.

Second, there is criticism of the composition of the lineup as unduly suggestive, and hence impermissible constitutionally, because the men who participated resembled the defendant, not the robber as described by Cohen shortly after the incident, and because only the defendant was exhibited with a bandaged hand. As to the selection for the lineup, we need not get into details beyond saying the criterion suggested might have had the effect of singling out the defendant (see *United States* v. *Wade,* 388 U.S. 218, 232-233 [1967]), and we do not see unfairness in the criterion used, which would avoid that consequence. See generally N. Sobel, Eye-Witness Identification § 56.03 (1972). Regarding a bandage, the defendant testified on the motion that he wore none at the lineup and three other witnesses agreed; while there was testimony by one witness in a contrary sense, we see no reason to disturb the judge's finding, which accords with the defendant's own statement.

Third, a confused argument is made about the question just when Cohen saw a picture of the defendant that was published in a local newspaper, the Medford Mercury, on April 10, 1974. The matter came up at the suppression hearing and Cohen testified he believed he had not seen the photograph and accompanying article until after the lineup identification. Thus all basis for suppression fell out. The motion judge made no findings on the matter. At trial the question was renewed, and the judge chose to conduct a voir dire. Cohen first said he had seen the picture before the lineup but then corrected himself and said it was afterward. There is no suggestion that the police were aware of the publication at the time of the lineup. The judge declined to exclude evidence of Cohen's lineup identification, and in the circumstances we see no error.[14] An assess-

---

[14] In the absence of contrivance by the police, the fact that a witness has previously seen newspaper display of the defendant seems not itself to have figured as the basis for excluding an identification. For discussion, see *United States* v. *Zeiler,* 470 F.2d 717, 719-720 (3d Cir. 1972); see also *United States* v. *Grose,* 525 F.2d 1115, 1117-1118 (7th Cir. 1975); *United States* v. *Boston,* 508 F.2d 1171, 1177-1178 (2d Cir. 1974), cert. denied, 421 U.S. 1001 (1975); *Norris* v. *State,* 265 Ind. 508, 511-513 (1976).

ment of all of Cohen's identification testimony was for the jury.[15]

2. *Trial.* (a) *Cross-examination.* The trial judge excluded questions on cross-examination of Cohen about whether he had a valid permit for the gun he fired on March 20, and about a prior arrest of Cohen for assault with a dangerous weapon (the charge had been reduced to assault and then dismissed). The defense tried to develop the theme that Cohen had a motive to put the blame for the victim's death on the defendant in order to relieve himself of such an onus. There was argument that the excluded questions had some tendency to prove bias, but this connection is hardly discernible.[16] Rather the questions seem related to establishing Cohen's criminal character, but on that footing they were inadmissible, as the possible misconduct pointed to was short of a conviction as required for impeachment under G. L. c. 233, § 21. See *Commonwealth* v. *Turner,* 371 Mass. 803, 809-810 (1977). Nor was this a case like *Davis* v. *Alaska,* 415 U.S. 308, 316-318 (1974), where the defense was held entitled to cross-examine to establish that the witness was on probation and thus subject to pressure to testify favorably to the prosecution. See also *Commonwealth* v. *Hogan,* 379 Mass. 190, 191-192 (1979). Cohen's arrest occurred in 1968 and did not survive as any threat to him at the time of trial seven years later. Compare *Commonwealth* v. *Santos,* 376 Mass. 920, 925 (1978).

Cohen had been convicted of receiving stolen property and the record of that conviction was properly used by the defense to impeach him. It was not error to exclude defense questions designed to show that Cohen had appealed the conviction but later withdrew the appeal. The defendant asserts that he was denied questions intended to show inconsistencies between Cohen's current testimony and state-

[15] On April 6, two days before the lineup, Cohen had identified the defendant's picture in a group of six pictures, calling it a "good look alike" and saying he would like to see the man in person.

[16] In fact the judge gave the defendant considerable scope in pursuing bias.

ments made by him in other judicial proceedings, but the assertion is not fortified by any demonstration of the claimed error or its significance, and so we need not consider it. See *Commonwealth* v. *Bernier,* 366 Mass. 717, 719-720 (1975).

(b) *Mistrial.* On the seventeenth day of trial Lieutenant Keating was called as a witness for the prosecution and testified briefly before adjournment for the day. That evening Keating suffered a heart attack and was placed in the coronary intensive care unit at Lawrence Memorial Hospital; he was unable to return to complete his direct testimony or to stand cross-examination. The judge promptly struck Keating's testimony (including a Miranda card admitted as an exhibit in connection with the testimony), and instructed the jury then and (in more general terms) in his final charge to disregard it. The defendant urges that it was error for the judge to deny his motion for a mistrial. It is generally accepted that when a witness becomes suddenly unavailable for cross-examination, the judge is not bound to declare a mistrial; in his discretion, if the likelihood of prejudice is slight, he may act just as the trial judge did here. See *Best* v. *Tavenner,* 189 Or. 46, 54-56 (1950); McCormick, Evidence 44-45 (2d ed. 1972); 5 J. Wigmore, Evidence § 1390 (Chadbourn rev. 1974). We think there was no chance of prejudice. As noted, Keating's testimony was brief; he had only gotten to the point of recounting the preliminaries to the defendant's statement of April 9 — that the defendant was informed of the warrant for his arrest, given his Miranda rights, asked if he understood the rights and was willing to waive them, and asked whether he recognized two pictures handed him. The testimony had not reached any contested issue. Nevertheless the judge allowed the defense (without waiving its objection to the denial of the mistrial) to read to the jury from Keating's direct and cross-examination at the suppression hearing; and the defense chose to read extensively from that transcript. We should add that it would not have been improper for the judge, in denying the mistrial, to give due consideration to the fact that the trial had gone seventeen days. See *United States* v. *Malinsky,*

153 F. Supp. 321, 323 (S.D.N.Y. 1957). It is contended that Keating was an indispensable witness because of his involvement in the Auburn interrogation, but the circumstances were fully developed through the direct and cross-examination of Sergeant Carr.[17]

3. *Question of G. L. c. 278, § 33E.* The Commonwealth contends that this defendant, indicted for murder in the first degree and convicted of murder in the second degree, is not entitled to a special review of "the whole case for . . . consideration of the law and the evidence" long required by G. L. c. 278, § 33E. This, the Commonwealth claims, results from the amendment of § 33E stated to be effective on July 1, 1979 (St. 1979, c. 346, § 2).

Section 33E, after amendment, is the equivalent of the second paragraph of that section in its earlier form but with the changes indicated (strike-through represents deletion from earlier text):

> "In a capital case as hereinafter defined the entry in the supreme judicial court shall transfer to that court the whole case for its consideration of the law and the evidence. Upon such consideration the court may, if satisfied that the verdict was against the law or the weight of the evidence, or because of newly discovered evidence, or for any other reason that justice may require (*a*) order a new trial or (*b*) direct the entry of a verdict of a lesser degree of guilt, and remand the case to the superior court for the imposition of sentence. For the purpose of such review a capital case shall mean a case in which the defendant was tried on an indictment for murder in the first degree and was convicted of murder ~~either~~ in the first ~~or second~~ degree. After the entry of the appeal in a capital case and until the filing of the rescript by the supreme judicial court mo-

---

[17] We are unpersuaded by the defendant's claim that he did not take the stand because Keating was unavailable for cross-examination. This was a decision for the defendant to make and does not produce error in the judge's action denying a mistrial.

tions for a new trial shall be presented to that court and shall be dealt with by the full court, which may itself hear and determine such motions or remit the same to the trial judge for hearing and determination. ~~If a motion is so remitted,~~ or [I]f any motion is filed in the superior court after rescript, no appeal shall lie from the decision of that court upon such motion unless the appeal is allowed by a single justice of the supreme judicial court on the ground that it presents a new and substantial question which ought to be determined by the full court."

The earlier text addressed itself aptly to the situation as it was before the founding of the Appeals Court: appeals of murder convictions of both types mentioned — first degree indictment with first degree conviction, and first degree indictment with second degree conviction — went direct to, and were entered in this court. Under the legislation connected with the creation of the Appeals Court, first degree convictions were still to go direct to this court. But appeals from second degree convictions under first degree indictments were to be entered in the Appeals Court (G. L. c. 211A, § 10), subject to our transferring them here. *Id.* Because of a doubt whether § 33E allowed for the special review at the hands of the Appeals Court, we regularly used our sua sponte power of transfer with respect to such appeals after they were entered in the Appeals Court. As those appeals upon transfer were entered in our court, there was conformance with the words "the entry in the supreme judicial court" appearing in the first sentence of text set out above.

The amendment of § 33E, eliminating the special review of the category of second degree convictions based on first degree indictments, may have been a response to the fact that such a conviction results in a sentence (life imprisonment with a possibility of parole after fifteen years) no more severe than sentences on convictions of various other crimes

for which the special review has not been provided.[18]   However, the question arises whether, as the Commonwealth contends, the amendment operates upon all cases in the category where appeal is entered in this court on or after July 1, 1979.

The contention must be held erroneous because it would lead to arbitrary and unreasonable results.   Take the present case.   According to the Commonwealth, the special review is eliminated simply because the "entry" in this court occurred after July 1, 1979.   But consider the actual table of · events.   The defendant was convicted on December 13, 1975, and sentenced on December 19, 1975; on the same day he filed his claim of appeal to the Appeals Court.   Certificate of notice of completion of the summary of the record was filed on June 16, 1977.   On March 9, 1978, the Commonwealth moved to dismiss the appeal for the defendant's failure to file his assignment of errors, but this was met by the defendant's motion to enlarge time to file the assignment, which was granted on April 19, 1978, and the assignment was filed on April 27, 1978.   On June 26, 1979, the case was entered in the Appeals Court.   This court on July 3, 1979, sua sponte ordered the case transferred here, and it was so entered on July 9, 1979.

The date of the "entry" in this court was a matter of chance.   Even if we disregard the fortuities in the four-year progress of the appeal up to the time of our order of transfer, it is evident that that order might just as well have come, say, on June 26, 1979, with entry here the next day. To make the right to the special review turn on such oddities would not make sense, and we should not ascribe such a design to the Legislature.   Thus the Commonwealth's contention is very infirm.

What, then, should be the incidence of the amendment of § 33E?   As a general rule, statutes are to be read in a pro-

---

[18] The § 33E review was not applicable to a conviction of second degree murder following indictment for that offense, or for sentences of life imprisonment upon conviction of crimes other than murder where parole was available only after fifteen years.   See G. L. c. 127, § 133A.

spective sense. See *Hanscom* v. *Malden & Melrose Gas Light Co.*, 220 Mass. 1, 3 (1914). As to criminal statutes, the rule is strongly reinforced by the constitutional prohibitions of ex post facto laws. Declaration of Rights of the Massachusetts Constitution, art. 24. Constitution of the United States, art. 1, § 10. It is not entirely clear whether the § 33E amendment, if applied to crimes committed before July 1, 1979, would offend against the ex post facto clauses. We have indicated that legislation which would have the effect of changing a discretionary sentence to a mandatory one could not be validly enforced with respect to crimes antedating the law. See *Commonwealth* v. *Harrington*, 367 Mass. 13, 20-21 (1975).[19] The amendment of § 33E partakes of this character in that it cuts off the court's power to weight sundry factors and adjudge whether an offense should be reduced or a new trial ordered.[20] So also we have held against application of subsequent legislation which aggravated the punishment established by law for the particular offense when it was committed, even where that took the rather mild form of tampering with good-conduct credits. See *Murphy* v. *Commonwealth*, 172 Mass. 264

---

[19] "[A] retroactive legislative change from discretionary to mandatory death sentence would be an unconstitutional ex post facto law. United States Constitution, art. 1, § 10. Declaration of Rights of the Massachusetts Constitution, art. 24. See *Commonwealth* v. *Gardner*, 11 Gray 438, 443 (1858); *Commonwealth* v. *Phelps*, 210 Mass. 78, 79-80 (1911); *Lembersky* v. *Parole Bd. of the Dept. of Correction*, 332 Mass. 290, 293 (1955); *Lindsey* v. *Washington*, 301 U.S. 397, 401 (1937). An unforeseeable judicial decision having the same effect is equally barred by the due process clause. *Bouie* v. *Columbia*, 378 U.S. 347, 353-354 (1964)."

[20] The § 33E review is broader than the doctrine of *Commonwealth* v. *Freeman*, 352 Mass. 556, 564 (1967), under which a court may examine a point on appeal although not properly preserved below where otherwise "there is a substantial risk of a miscarriage of justice." The search under § 33E is a more general and an obligatory one for a result that may be "more consonant with justice." *Commonwealth* v. *Seit*, 373 Mass. 83, 94 (1977), quoting from *Commonwealth* v. *Baker*, 346 Mass. 107, 109 (1963). That this kind of search has not often eventuated in relief to defendants does not affect our discussion.

(1899).[21]  See also *Lembersky* v. *Parole Bd. of the Dep't of Correction,* 332 Mass. 290, 293 (1955); *Greenfield* v. *Scafati,* 277 F. Supp. 644 (D. Mass. 1967) (three-judge court), aff'd, 390 U.S. 713 (1968) (per curiam).  Cf. *Lindsey* v. *Washington,* 301 U.S. 397 (1937); *Kring* v. *Missouri,* 107 U.S. 221 (1882).  We must acknowledge that we find no precedent directly in point, and that there are some cases from which analogies may be drawn that would perhaps justify the application of the § 33E amendment to past crimes.  See *Mallett* v. *North Carolina,* 181 U.S. 589 (1901) (State's right to appeal applied retroactively).  See also *People* v. *O'Bryan,* 165 Cal. 55 (1913); *State* v. *Witte,* 243 Wis. 423 (1943).  But see *In re Jones,* 500 P.2d 690 (Wyo. 1972).[22]  Whatever conclusion might be reached on strict analysis, we think this is a field where a court does well to tread lightly, and so we are inclined, "under the influence — if not the command"[23] of the ex post facto provisions, to rule that the special review remains available where, as in the present case, the offense resulting in a second degree murder conviction upon an indictment in the first degree was committed before July 1, 1979.  As to such cases we

---

[21] The court in *Murphy,* holding that the statute should attach only to crimes committed after its enactment, said broadly that a law is subject to the ex post facto objection if "it will increase the penalty, or operate to deprive a party of substantial rights or privileges to which he was entitled as the law stood when the offence was committed, or 'in short, which, in relation to the offence or its consequences, alters the situation of a party to his disadvantage.'" *Murphy* v. *Commonwealth,* 172 Mass. 264, 269 (1899), quoting the latter words from *Kring* v. *Missouri,* 107 U.S. 221, 228-229 (1882).

[22] The conventional explanations of the ex post facto doctrine — e.g., that to apply subsequent legislation would defeat "reliance" or "expectation" without serving a deterrent function — are analyzed in some detail in Note, Ex Post Facto Limitations on Legislative Power, 73 Mich. L. Rev. 1491 (1975).  In some respects the doctrine appears to look not to the effects on the individual but to a notion of the just ordering of a legal system which is suspicious of a lawmaker who seeks to switch penal rules after the event.  Cf. J. Rawls, A Theory of Justice 238 (1971).

[23] The expression is taken from *Byrd* v. *Blue Ridge Rural Elec. Coop., Inc.,* 356 U.S. 525, 537 (1958), where the constitutional provision referred to was the Seventh Amendment to the United States Constitution.

shall follow our practice of sua sponte transfer to this court from the Appeals Court. The category will exhaust itself in course of time.

The record in the present case has been accorded the § 33E review. No reason appears for reducing the offense or granting a new trial.

*Judgments affirmed.*