NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12715

COMMONWEALTH  vs.  ESSIE BILLINGSLEA.


Middlesex.      October 1, 2019. - April 30, 2020.

Present:  Gants, C.J., Lenk, Gaziano, Lowy, Budd, Cypher, &
Kafker, JJ.


Rape.  Habitual Offender.  Appeals Court, Concurrent
    jurisdiction.  Practice, Criminal, Capital case, Waiver of
    trial by jury, Voir dire, Instructions to jury, Jury and
    jurors.


    Indictments found and returned in the Superior Court
Department on August 15, 2014.

    The cases were tried before Thomas P. Billings, J.


    Alan D. Campbell for the defendant.
    Jessica Langsam, Assistant District Attorney, for the
Commonwealth.


    CYPHER, J.  We are asked to determine whether a third

conviction of one of the crimes enumerated in G. L. c. 279, § 25

(b), may be reviewed by the Appeals Court.  The defendant was

indicted for various serious felonies arising from a brutal

attack and rape.[1]  Each indictment, in addition to charging the specific felony, also alleged that the sentence for that felony should be enhanced pursuant to the habitual criminal provision

---

[1] The jury found the defendant guilty of armed assault in a dwelling with a knife, G. L. c. 265, § 18A; home invasion, G. L. c. 265, § 18C; three counts of aggravated rape, G. L. c. 265, § 22 (a); assault by means of a dangerous weapon (knife), G. L. c. 265, § 15B (b); kidnapping, G. L. c. 265, § 26; breaking and entering a building in the daytime with intent to commit a felony, G. L. c. 266, § 18; and assault with intent to rape, G. L. c. 265, § 24.  The defendant was found not guilty of assault and battery by means of a dangerous weapon (knife), G. L. c. 265, § 15A (b); and assault by means of a dangerous weapon (firearm), G. L. c. 265, § 15B (b).

of G. L. c. 279, § 25 (a),[2] or the habitual offender provision of § 25(b), or both.[3,4]

---

[2] The habitual criminal portions of the indictments alleged, and the Commonwealth presented evidence that the defendant previously had been convicted of and sentenced to, (1) rape of a child by force, G. L. c. 265, § 22A, with a sentence of five years; (2) rape and abuse of a child second or subsequent, G. L. c. 265, § 23, with a sentence of from six to ten years; (3) indecent assault and battery on a child, G. L. c. 265, § 13B, with a sentence of from four to five years; (4) assault with a deadly weapon (shotgun), G. L. c. 265, § 15B (b), with a sentence of from four to five years; (5) assault with a deadly weapon (handgun), G. L. c. 265, § 15B (b), with a sentence of from four to five years; and (6) armed assault to rob (knife), G. L. c. 265, § 18 (b), with a sentence of from four to five years.

[3] The habitual offender portions of the indictments alleged that the defendant had been convicted and imprisoned on two of the crimes enumerated in note 2, supra: (1) rape of a child by force, G. L. c. 265, § 22A, serving a sentence of more than three years; and (2) indecent assault and battery on a child, G. L. c. 265, § 13B, serving a sentence of more than three years.

[4] A habitual criminal under G. L. c. 279, § 25(a), is defined as someone who is "convicted of a felony and has been previously twice convicted and sentenced to state prison or state correctional facility or a federal corrections facility for a term not less than [three] years by the commonwealth, another state or the United States." If the Commonwealth can establish that the person has not been pardoned for either of the prior two crimes on the grounds that he or she was innocent, the habitual criminal is sentenced to the "maximum term provided by law."

A habitual offender under G. L. c. 279, § 25(b), must have been convicted twice previously of one of the enumerated offenses in the statute or

> "of a like violation of the laws of another state, the United States or a military, territorial or Indian tribal authority, arising out of charges separately brought and tried, and arising out of separate and distinct incidents

After being convicted, the defendant moved in the Appeals Court to vacate the entry of his appeal in that court and to have the case entered directly in this court. He argued that because his case is defined as a "capital case" by G. L. c. 278, § 33E, as amended by St. 2012, c. 192, §§ 143-144, he was entitled to have it entered directly in, and decided by, this court in the first instance.[5] The Appeals Court denied his

---

that occurred at different times, where the second offense occurred subsequent to the first conviction . . ."

A habitual offender must have been sentenced to a term of imprisonment of at least three years for each of the prior two convictions with no pardon for innocence on either conviction, and he or she similarly receives the maximum sentence provided by law. Under § 25(b), however, "[n]o sentence imposed . . . shall be reduced or suspended nor shall such person so sentenced be eligible for probation, parole, work release or furlough or receive any deduction from such person's sentence for good conduct."

[5] General Laws, c. 278, § 33E, provides:

"In a capital case as hereinafter defined the entry in the supreme judicial court shall transfer to that court the whole case for its consideration of the law and evidence. Upon such consideration the court may, if satisfied that the verdict was against the law or the weight of the evidence, or because of newly discovered evidence, or for any other reason that justice may require (a) order a new trial or (b) direct the entry of a verdict of a lesser degree of guilt, and remand the case to the superior court for the imposition of sentence. For the purpose of such review a capital case shall mean: (i) a case in which the defendant was tried on an indictment for murder in the first degree and was convicted of murder in the first degree; or (ii) the third conviction of a habitual offender under subsection (b) of [§] 25 of c[.] 279. After the entry of the appeal in a capital case and until the filing of the rescript by the supreme judicial court motions for a

motion without prejudice to renewal in this court. We ordered
that the defendant's appeal be transferred to this court. For
the reasons that follow, we hold that a direct appeal from the
third conviction of a habitual offender pursuant to G. L.
c. 279, § 25 (b), may be entered in the Appeals Court, that this
direct appeal is entitled to the unique review prescribed by
§ 33E, and that the Appeals Court may conduct such § 33E review.
We also address the other issues raised by the defendant.

Background. 1. Facts. We recite the facts as the jury
could have found them, reserving certain details for later
discussion.

At around 6:30 P.M. on June 1, 2014, the victim was in her
second-floor apartment. She heard a noise from the back porch
and went to investigate. In a "split second," she saw the
silhouette of a large African-American man (the defendant) who
punched her "extremely hard" in the face, causing her to bleed
profusely.

---

new trial shall be presented to that court and shall be
dealt with by the full court, which may itself hear and
determine such motions or remit the same to the trial judge
for hearing and determination. If any motion is filed in
the superior court after rescript, no appeal shall lie from
the decision of that court upon such motion unless the
appeal is allowed by a single justice of the supreme
judicial court on the ground that it presents a new and
substantial question which ought to be determined by the
full court."

The defendant pushed the victim into her bedroom and demanded that she take off her clothes.  Over the next hour, he brutally sexually assaulted her.  At some point, he yelled at the victim and ordered her to make a blindfold; she complied.

At around 7:30 P.M., the victim's boyfriend telephoned her to inform her that he was on his way to her residence.  The defendant instructed the victim to answer the telephone, and shortly thereafter told the victim to call the boyfriend back and tell him not to come to the apartment.  Because of the victim's monotone voice and one word replies to his questions during both calls, the boyfriend called 911 and requested that the police go to the victim's apartment to conduct a well-being check.

A short time later, the defendant was sitting next to the victim on the living room couch when they both heard a noise from a car door.  The defendant went to the window and "said something like, 'Oh, shit, the cops.'"

When her boyfriend arrived at the victim's home, two police officers were already at the front door.  A light in the apartment briefly turned on and off, but no one opened the door. The boyfriend led police to the side of the house, where a door was unlocked, and into the basement.  He and one of the officers saw what appeared to be two people coming down the stairs, one of whom was naked from at least the top of the thighs down.

The victim testified that shortly after she heard the car door, she could hear the doorbell and people calling her name, but she was in "utter . . . shock" and "catatonic." The defendant walked "snug up" behind her and ushered her, still completely naked and blindfolded, through the kitchen and down the back stairwell. When they reached the halfway point of the lower set of stairs, an officer identified himself and began walking toward the victim. The defendant pulled away from her and managed to flee the residence.

The victim told her boyfriend, "I got raped. I thought I was going to die."

Meanwhile, one of the officers in pursuit of the defendant made eye contact with him. The defendant said, "Come and get me," before running. When the officer approached the defendant, the defendant lunged at him twice. After a struggle, the defendant was handcuffed and continued to kick, roll around, and yell. A large steak knife, a box cutter, and a cellular telephone (cell phone) were recovered from the defendant.[6]

At trial, the defendant testified that he and the victim had been in a sexual relationship and that their encounter was consensual. He testified that he was homeless and could not

---

[6] Investigators also found a walkie-talkie radio and duct tape in the clothing the defendant left in the victim's apartment.

leave anything at the shelter, which implied that this was the reason that he had a knife, box cutter, duct tape, and other items with him at the victim's home. He testified that he struck the victim in the face after they had an argument about their respective significant others. He stated that when the victim's boyfriend arrived, she told the defendant to "just go out the back," and he was confused by his encounter with the officers who "slammed [him] to the concrete," put him "in a choke hold," and handcuffed him.

2. The sentencing enhancement provisions of the indictments. After the jury convicted the defendant, he executed a written waiver, and a bench trial was held on the habitual offender portion of the indictments. The defendant filed a motion to dismiss the habitual offender portion of the indictments on the ground that they did not allege that he previously had committed the same offenses. The judge denied the motion. The Commonwealth then filed a nolle prosequi as to the habitual criminal enhancements and moved for sentencing on the habitual offender enhancements. The judge sentenced the defendant to life in prison without the possibility of parole on the charge of armed assault in a dwelling with a knife, G. L. c. 265, § 18A. The defendant also was sentenced on the remaining charges of home invasion; three counts of aggravated rape; assault by means of a dangerous weapon -- knife;

kidnapping; breaking and entering a building in the daytime with intent to commit a felony; and assault with intent to rape. The defendant filed a notice of appeal in the Appeals Court.

Discussion. 1. Appellate jurisdiction of the third conviction of a habitual offender under G. L. c. 278, § 33E, the history of G. L. c. 278, § 33E, and the transformation of § 33E powers. General Laws c. 278, § 33E, guarantees a defendant's right to appeal a conviction after trial of murder in the first degree directly to the Supreme Judicial Court and grants a more searching and comprehensive standard of review than ordinary appellate procedure.[7] Section 33E originally provided, in part: "The clerk shall . . . transmit . . . the record on appeal, to . . . the supreme judicial court for the commonwealth . . . . The entry thereof shall not transfer the case but on the questions to be determined. The supreme judicial court shall consider the questions of law fairly raised." See St. 1926, c. 329, § 4; G.L. 1932 (Ter. Ed).

An amendment in 1939 added a second paragraph to § 33E, which now comprises, in essence, the entire section. See St.

---

[7] After the direct appeal, however, as we discuss, a defendant in a capital case must contend with the gatekeeper provision of § 33E, see discussion infra, where a defendant in a noncapital case may file any number of appeals from motions for postconviction relief without obtaining permission from a gatekeeper. Mass. R. Crim. P. 30 (c) (8), as appearing in 435 Mass. 1501 (2001).

1939, c. 341. "The [1939] amendment was enacted in part to remedy the defects in such procedures which had been especially evident in the celebrated cases of" Nicola Sacco and Bartolomeo Vanzetti. Commonwealth v. Brown, 376 Mass. 156, 167 (1978), citing Commonwealth v. Sacco, 259 Mass. 128 (1927), and Commonwealth v. Sacco, 255 Mass. 369 (1926).

These "defects" were emphasized by the Judicial Council,[8] which published in 1927, shortly after the executions of Sacco and Vanzetti, the entire docket of the trial in order to "illustrate[] in a striking way some serious defects in our methods of administering justice." Third Report of the Judicial Council, Pub. Document No. 144, at 37 (Nov. 1927), reprinted in 13 Mass. L.Q. 1 (1927). Although the council recommended granting the court the power to consider the whole case and order a new trial if justice requires, the impetus for the recommendation appears to be, in part, the six-year delay between the verdict and the execution, rather than the errors at

---

[8] The Judicial Council was created in 1924 when a legislative commission suggested it be implemented to "make a continuous study of the courts, report annually to the Governor on the work of the judicial branch and suggest rules of practice and procedure to the courts." Johnedis, "Creation of the Appeals Court and its Impact on the Supreme Judicial Court," The History of the Law in Massachusetts: the Supreme Judicial Court 1692-1992, at 451 (1992). It was comprised of judges from various courts and lawyers, and eventually played a significant role in the founding of the Appeals Court. Id.

the trial . Id at 37-38, 42, 78 (Appendix A). Allen, Section 33E Survives the Death Penalty: Why Extraordinary Review of First-Degree Murder in Massachusetts Serves No Compelling Purpose, 45 Suffolk U.L. Rev. 979, 988-989 (2012) ("But the focus was neither predominantly on the trial's injustice nor on abolishing the death penalty; rather the Judicial Council reserved its particular criticism for the extraordinary, six-year delay between the verdict and execution").[9]

In 1937 and 1938, the Judicial Council again recommended that the Supreme Judicial Court "be given power to review the evidence in capital cases and make such orders as justice may seem to require."[10] Thirteenth Report of the Judicial Council,

---

[9] Justice Felix Frankfurter detailed the many egregious errors in the Sacco and Vanzetti case. Frankfurter, The Case of Sacco and Vanzetti, The Atlantic, 409 (Mar. 1927). He described the prosecutor's willingness to put forth unreliable witnesses with contradictory testimony and the judge's inability or unwillingness to appropriately instruct the jury (among other serious issues). Id. at 411-416, 421-424. Written while he was a professor at Harvard Law School, Justice Frankfurter's meticulous analysis highlighted the need for an appellate court to conduct plenary review to remedy such injustice. See id. at 427 ("Th[e] court could not inquire whether the facts as set forth in the printed record justified the verdict. . . . What is reviewed in effect is the conduct of the trial judge; only so called questions of law are open").

[10] Both in 1937 and a decade earlier, the Judicial Council looked to other States' treatment of first-degree murder appeals. Thirteenth Report of the Judicial Council, supra at 29; Third Report of the Judicial Council, supra at 42-43. In 1927, the Council noted that a recent statute had vested the same broad power in the New York Court of Appeals. Third Report of the Judicial Council, supra at 42. In 1937, when considering

Pub. Document No. 144, at 28-30 (Nov. 1937), reprinted in 23 Mass. L. Q. 1(1938); Fourteenth Report of the Judicial Council, Pub. Document No. 144, at 14-16 (Nov. 1938). The amendment to § 33E proposed by the Judicial Council guaranteed that the entry of an appeal in a capital case transferred to the Supreme Judicial Court the whole case for consideration of the facts as well as the law. See Thirteenth Report of the Judicial Council, supra at 30; Fourteenth Report of the Judicial Council, supra at 16. See also Third Report of the Judicial Council, supra at 78 (Appendix A). It also served to reduce frivolous appeals by imposing the requirement that after one plenary review, to file a motion for a new trial, a defendant must pass the scrutiny of a single justice of the Supreme Judicial Court acting as a gatekeeper. See St. 1939, c. 341.

In 1962, § 33E was amended to broaden this court's powers in the review of capital cases. St. 1962, c. 453. For the first time, the court had a duty to consider the degree of guilt and was given the power to direct the entry of a verdict of a lesser degree of guilt. Id. In the first case to apply the 1962 amendment, the court explained its new power:

---

whether the recommended change would place any undue burden on the Supreme Judicial Court, the report noted that "[s]uch a power exists in appellate courts in England and Scotland" and it cited a survey done by two professors that reported that appellate courts in twenty-two States exercised similar powers. Thirteenth Report of the Judicial Council, supra at 29.

> "If upon our examination of the facts, we should, in our discretion, be of opinion that there was a miscarriage of justice in convicting the defendant of murder in the first degree, and that a verdict of guilty of murder in the second degree or of manslaughter would have been more consonant with justice, it is now our power and duty so to declare. This is a power which the trial court does not have."

Commonwealth v. Baker, 346 Mass. 107, 109 (1963).

Before the 1962 amendment, a murder case did not remain a "capital case" under §33E after a verdict of guilty of murder in the first degree unless there was a recommendation that the death penalty be imposed. Baker, 346 Mass. at 109 n.1. After the 1962 amendment until 1979, a capital case under § 33E was one in which a defendant was tried on an indictment for murder in the first degree and convicted of murder in either the first or second degree.

In 1979, § 33E was amended to eliminate special review by this court of convictions of murder in the second degree based on indictments charging murder in the first degree. St. 1979, c. 346, § 2. The special rules for murder in the first degree in § 33E are rooted in the fact that the crime is the most heinous cognizable under law and the sentence of death (now life in prison without the possibility of parole) was the most severe punishment imposed. Dickerson v. Attorney Gen., 396 Mass. 740, 744 (1986) ("Th[e] uniquely thorough review of first degree murder convictions is warranted by the infamy of the crime and

the severity of its consequences").[11]  During the seven-year

period between the creation of the Appeals Court in 1972, see

G. L. c. 211A, § 1, and the removal of convictions of murder in

the second degree from the definition of "capital case," the

respective roles of the two courts were being clarified.  See

G. L. c. 211A, § 10 (granting Appeals Court concurrent appellate

jurisdiction with Supreme Judicial Court unless otherwise

limited).  This court, in an abundance of caution about whether

the Appeals Court had power of special review under § 33E,

"regularly used [its] sua sponte power of transfer with respect

to such appeals after they were entered in the Appeals Court."

Commonwealth v. Davis, 380 Mass. 1, 13 (1980).  There is no

longer be any doubt that the Appeals Court is capable of

providing plenary review of "capital cases."  Based on the plain

language of the statute and this court's reasoning that not

every statutory reference to "the supreme judicial court" is a

literal reference to this court, see Commonwealth v. Friend, 393

_____

[11] In Commonwealth v. Davis, 380 Mass. 1, 13-14 (1980), the
court considered the possible reasoning for removing murder in
the second degree from the statute, "The amendment of § 33E,
eliminating the special review of the category of second degree
convictions based on first degree indictments, may have been a
response to the fact that such a conviction results in a
sentence (life imprisonment with a possibility of parole after
fifteen years) no more severe than sentences on convictions of
various other crimes for which the special review has not been
provided."

Mass. 310, 312 (1984), we conclude that the Appeals Court also has the power and authority to conduct plenary review.[12]

In 2012, the Legislature again amended § 33E to include "the third conviction of a habitual offender under" G. L. c. 279, § 25 (b).  G. L. c. 278, § 33E, as amended by St. 2012, c. 192, § 44.  This act "relative to sentencing and improving law enforcement tools" has the explicit purpose of "strengthening . . . the laws relative to habitual offenders," and "provid[ing] additional law enforcement tools."  St. 2012, c. 192.  We next consider this statutory amendment in light of the history and development of the Appeals Court as well as the purpose of G. L. c. 211A, § 10.

2.  Creation of the Appeals Court and jurisdiction under G. L. c. 211A, § 10.  In 1972, the Legislature created the Appeals Court as the Commonwealth's intermediate appellate court.  G. L. c. 211A, inserted by St. 1972, c. 740.  The Appeals Court "substantially reduced" the "intolerable caseload" of the Supreme Judicial Court and allowed this court "to concentrate on those appeals involving novel or serious legal issues of general application and broad impact".[13]  Tauro, The

___

[12] See discussion, infra.

[13] The creation of the Appeals Court came on the heels of over a century of increased recognition of the high volume of this court's caseload.  See Report of the Commission to Investigate the Causes of Delay in the Administration of Justice in Civil Actions 13-14, 1910 House Doc. No. 1050.  See generally

State of the Judiciary, 57 Mass. L.Q. 209, 213 (1972).  See

Johnedis, The Founding of the Massachusetts Appeals Court, 1

Sup. Jud. Ct. Hist. Soc'y J. 44, 60 (1995).

The Legislature provided the Appeals Court with "concurrent

appellate jurisdiction with the supreme judicial court, to the

extent review is otherwise allowable . . . except in review of

convictions for first degree murder" (emphasis added).  G. L.

c. 211A, § 10.  See Johnedis, Massachusetts' Two-Court Appellate

System:  A Decade of Development, 67 Mass. L. Rev. 103, 103-105

(Fall 1982) (Two-Court Appellate System) (discussing scope of

jurisdiction and power of Appeals Court).

In determining whether § 10 allows for appeals by habitual

offenders to be entered in the Appeals Court in the first

instance, we examine § 33E in conjunction with G. L. c. 211A,

---

Johnedis, The Founding of the Massachusetts Appeals Court, 1
Sup. Jud. Ct. Hist. Soc'y J. 44 (1995).  In 1927, the Judicial
Council noted in its report to the Governor that this court's
appellate case load was "far in excess of what should be
expected, or required, of them."  See Third Report of the
Judicial Council, supra at 43.  However, the Judicial Council
rejected a proposal to create an intermediate appellate court at
that time.  Id. at 45-46.  "[A]ppeals continued to pour into the
Supreme Judicial Court in great numbers, presenting issues of
increasing difficulty," and in 1967, the Judicial Council began
taking steps to create an intermediate appellate court.  See
Johnedis, supra at 47, 49.  See id. at 44, 47 & n.25, 49-53
(discussing reasons for increased appellate caseload leading to
Appeals Court's creation).  Once the idea of creating an
intermediate appellate court gained momentum, enacting
legislation was drafted, and Governor Francis W. Sargent and
Supreme Judicial Court Chief Justice G. Joseph Tauro advocated
for the legislation's enactment.  See id. at 57-59.

§ 10 "in the context of the entire statutory scheme and the historical background of the relevant provisions." Friend, 393 Mass. at 312. Because this court's existence predated the establishment of the Appeals Court by almost three centuries, "[m]ost statutes authorizing appeals from decisions in the lower courts were originally drafted prior to the formation of the Appeals Court in 1972."[14] Id. at 312. See Johnedis, Two-Court Appellate System, supra at 104. See, e.g., Commonwealth v. Ortiz, 425 Mass. 1011, 1012 (1997) (Commonwealth's appeal pursuant to G. L. c. 278, § 28E, from Superior Court order dismissing indictment was properly entered in Appeals Court in first instance and should not have been entered in this court).

---

[14] General Laws c. 211A, § 5, provided the Appeals Court with the power and authority necessary to fulfill its obligations, and early on the Appeals Court addressed the application of statutes that by their terms or through interpretation had applied to the Supreme Judicial Court. See G. L. c. 211A, § 5 ("The appeals court shall be vested with all powers and authority necessary to carry into execution its judgments, decrees, determinations and orders in matters within its jurisdiction according to the rules and principles of common law and the Constitution and laws of the commonwealth, and subject to the appellate jurisdiction, supervision and superintendence of the supreme judicial court"); Rooney v. Sletterink, 4 Mass. App. Ct. 124, 126 (1976) ("Ordinarily, statutes which were in effect prior to the establishment of [the Appeals Court, see G. L. c. 211A, inserted by St. 1972, c. 740,] and which are related to proceedings on appeal to the Supreme Judicial Court, are applicable to [the Appeals Court]"); Paananen v. Rhodes, 1 Mass. App. Ct. 12, 15 n.4 (1972) (statute applicable by its terms to Supreme Judicial Court made applicable to Appeals Court by G. L. c. 211A, § 5).

Requiring habitual offender appeals to be entered in and decided by this court in the first instance, rather than direct entry in the Appeals Court, would ignore both the purpose for the creation of the Appeals Court and the plain language of single exception to concurrent jurisdiction for first-degree murder appeals in G. L. c. 211A, § 10.[15]  See Davis, 380 Mass. at 13; Commissioner of Correction v. Superior Court Dep't of the Trial Court for the County of Worcester, 446 Mass. 123, 124 (2006) ("Statutory language should be given effect consistent with its plain meaning. Where, as here, that language is clear and unambiguous, it is conclusive as to the intent of the Legislature").

---

[15] The defendant argues that it is "incongruous" to make § 25 (b) appeals subject to plenary review by the Appeals Court because when § 10 was written the only capital cases were first-degree murders.  His assertion is only partially accurate.  As discussed supra, at the time G. L. c. 211A, § 10, was enacted, G. L. c. 278, § 33E, defined a "capital case" as one in which the defendant was "tried on an indictment for murder in the first degree and was convicted of murder either in the first or second degree."  See, e.g., G. L. c. 278, § 33E, as amended through St. 1962, c.453.  Following the passage of G. L. c. 211A, § 10, in 1972, although second-degree murder cases still qualified as "capital cases" under § 33E, they were nevertheless entered in the Appeals Court because G. L. c. 211A, § 10, provided for the Appeals Court's concurrent jurisdiction in all appeals other than first-degree murder appeals.  See Davis, 380 Mass. at 12-13; Johnedis, Massachusetts' Two-Court Appellate System:  A Decade of Development, 67 Mass. L. Rev. 103, 105 (Fall 1982).

3. <u>Guidance to the Appeals Court when performing § 33E review</u>. To assist the Appeals Court in exercising § 33E review, we summarize the provisions of § 33E review as applied to first-degree murder convictions, determine which convictions under G. L. c. 279, § 25 (<u>b</u>), are entitled to § 33E review, and prescribe which provisions of § 33E review are applicable to those convictions.[16]

a. <u>Defining § 33E review of first-degree murder convictions</u>.[17] Defendants in first-degree murder cases have a direct appeal to the Supreme Judicial Court as of right under § 33E, <u>Trigones</u> v. <u>Attorney Gen</u>., 420 Mass. 859, 863 (1995), and these cases are excluded from Appeals Court jurisdiction under G. L. c. 211A, § 10. Section 33E review grants this court the power to (i) conduct plenary review of a defendant's case on direct appeal; (ii) reduce a defendant's conviction to a lesser

---

[16] Additionally, our decision -- that appeals from the third conviction of a habitual offender are to be entered first in the Appeals Court -- does not preclude this court from considering those cases with novel issues or issues of public concern, before they are heard and decided by the Appeals Court, via direct review (either on application for direct appellate review of a party or by exercising our power to transfer cases on our own initiative), nor does it preclude us from entertaining a case on further appellate review after it has been heard and decided by the Appeals Court.

[17] For a detailed description of the scope of this court's powers under G. L. c. 278, § 33E, see J.M. Greaney and J.F. Comerford, The Law of Homicide in Massachusetts, at 255-259 (2d ed. 2016).

degree of guilt or mandate a new trial; and (iii) require a finding by a judicial gatekeeper that the appeal from an order on a motion for a new trial presents new and substantial issues before it may be considered by the full court.  Defendants whose direct appeals are subject to § 33E also are afforded, by court rules, certain liberties regarding the time allowed for filing a brief and for oral argument.

i.  Plenary review.  Plenary review means that in direct appeals that are subject to § 33E, the court is required to review the entire case on the law and the facts, which includes a reading of the entire trial record.  See, e.g., Commonwealth v. Healy, 393 Mass. 367, 385-386 (1984), S.C., 438 Mass. 672 (2003) (reviewed 3,500 trial transcript pages).  Moreover, the court must review the entire record in every capital case regardless of whether the defendant has specifically requested such review.  See, e.g., Commonwealth v. Goudreau, 422 Mass. 731, 735 (1996); Commonwealth v. Johnson, 422 Mass. 420, 429-430 (1996).  See also Commonwealth v. Wade, 428 Mass. 147, 148 (1998), S.C., 467 Mass. 496 (2014) and 475 Mass. 54 (2016).  We may ask the parties to brief an issue that neither party raised on appeal.  See Commonwealth v. Gunter, 427 Mass. 259, 260-261 (1998), S.C., 456 Mass. 1017 (2010), and 459 Mass. 480, cert. denied, 565 U.S. 868 (2011).  Thus, the court has the authority to grant relief because of an error that the defendant did not

raise at trial or on appeal.  See, e.g., Commonwealth v.

Anderson, 425 Mass. 685, 691 (1997); Goudreau, supra at 735.

Regarding unpreserved or unargued errors, we first

determine whether an error occurred and, if so, examine the

record to determine whether the error created a substantial

likelihood of a miscarriage of justice by having "likely to have

influenced the jury's conclusion."  Commonwealth v. Goitia, 480

Mass. 763, 768 (2018), quoting Commonwealth v. Wright, 411 Mass.

678, 682 (1992), S.C., 469 Mass. 447 (2014).  Such an error

would mandate that we exercise our authority under § 33E either

to reduce the sentence or order a new trial.  We note, however,

that this power is not without limitation.

> "Neither the conventional type of appellate review
> permitted in a criminal case, nor the special type
> prescribed by G. L. c. 278, § 33E, for a 'capital case,' is
> intended to afford an opportunity, from the vantage point
> of hindsight, to comb the trial record for interesting
> questions which could have been, but in fact were not,
> raised at the trial, or to attempt to convert the
> consequences of unsuccessful trial tactics and strategy
> into alleged errors by the judge."

Commonwealth v. Johnson, 374 Mass. 453, 465 (1978), S.C., 409

Mass. 405 (1991). See Commonwealth v. Gricus, 317 Mass. 403, 406

(1944) ("Th[e] statute opens the facts as well as the law for

our consideration.  It does not, however, convert this court

into a second jury, which must be convinced beyond a reasonable

doubt of the guilt of the defendant by reading the reported

evidence, without the advantage of seeing and hearing the witnesses").

ii. Reduction of verdict. This court may overturn a conviction and remand the case to the Superior Court for a new trial or reduce a conviction of murder in the first degree to a conviction on a lesser charge, for any reason that justice may require. See G. L. c. 278, § 33E, as amended by St. 1962, c. 453. (allowing Supreme Judicial Court to enter verdict of lesser degree of guilt). However, despite errors in a trial, this court may decline to reduce a defendant's conviction if the evidence against the defendant is overwhelming and no substantial likelihood of a miscarriage of justice exists. See Commonwealth v. Sanna, 424 Mass. 92, 108 (1997).

Significantly, this court grants relief under § 33E extremely rarely and only in the most extraordinary circumstances.

> "From 2001-2010, a total of 282 first-degree murder cases entered into the Supreme Judicial Court. Of these, the court reversed or reduced only twenty-three, a reversal rate of 8.2%. But ten of these reversals, almost half, came in 2009 and 2010. Without these exceptional years, the reversal rate (from 2001-2008) was actually only 5.94%."

Allen, supra, at 993.[18]

---

[18] "During the 2000s, the Appeals Court reversed eleven of the sixty-three second-degree murder cases it reviewed, 17.5%. The [Supreme Judicial Court (SJC)] . . . reversed an additional four cases. All these appeals, whether disposed in the Appeals Court, directly in the SJC, or reviewed by the SJC after an

We have conducted a comprehensive but nonexhaustive search of cases on appeal between 2011 and 2019 where a defendant was convicted of murder in the first degree.  Of approximately 296 cases, we reversed convictions thirty-seven times.  However, we discovered only four cases in which we exercised our power under § 33E to reverse the conviction, i.e., only 1.35 percent of the total number of appeals.  In each of the four cases, we then reduced the verdict.[19]  See Commonwealth v. Dowds, 483 Mass. 498,

initial appeal of right to the Appeals Court, were heard under ordinary criminal procedure, including the rule that issues not raised at trial are waived upon appeal.  Overall, the reversal rate (out of the total seventy appeals) was 21.4%.  This survey strongly suggests that ordinary criminal procedure offers greater hope for defendants seeking appellate relief pursuant to section 33E."

Allen, supra at 993-994.

See Brandt & DeJuneas, Special Considerations in Criminal Briefs, in N. Quenzer & F. Spina, Appellate Practice in Massachusetts, 15.3.4 (4th ed. Mass. Cont. Legal Educ. 2016) ("It must be acknowledged, however, that in recent years the Supreme Judicial Court appears to be more reluctant to reduce the degree of guilt than it was in the past . . . Between 1980 and 1992, the court ordered a verdict reduction ten times in a total of 312 direct appeals from murder convictions.  In contrast, between 1998 and 2008 the court decided 280 first-degree murder appeals and did not use its [§] 33E powers to reduce the verdict in a single one").

[19] In three other cases we examined, although the defendants' convictions were upheld, their sentences were reduced pursuant to this court's decision in Diatchenko v. District Attorney for the Suffolk Dist., 466 Mass. 655, 658, 674 (2013), S.C., 471 Mass. 12 (2015) (sentencing of juveniles convicted of murder in first degree to life without meaningful opportunity for parole violates Massachusetts Constitution).

499 (2019) (verdict reduced to murder in second degree where defendant had brain injuries that affected cognition and behavior); Commonwealth v. Salazar, 481 Mass. 105, 120 (2018) (verdict reduced to murder in second degree where evidence of deliberate premeditation was "far from compelling," intoxication defense was presented "incompletely," and prosecutor made "inappropriate" statement about intoxication); Commonwealth v. Vargas, 475 Mass. 338, 366-367 (2016) (verdict reduced to voluntary manslaughter in context of senseless brawl); Commonwealth v. Berry, 466 Mass. 763, 773-774 (2014) (verdict reduced to murder in second degree where defendant had history of mental illness and brain tumor that affected behavior).

This court's authority to reduce a conviction of murder in the first degree in the interest of justice "should be used sparingly and with restraint."[20] Commonwealth v. Brown, 477

---

See Commonwealth v. Fernandez, 480 Mass. 334, 347-348 (2018); Commonwealth v. Ray, 467 Mass. 115, 139-140 (2014); Commonwealth v. Keo, 467 Mass. 25, 46-47 (2014).

[20] Some authors have argued that the benefit defendants receive pursuant to § 33E review is outweighed by the burden it puts on the court and the limitation it creates on future appeals in first-degree murder cases. See Allen, supra at 979 (§ 33E review "serves no justifiable purpose; rather, it routinely dumps meritless, automatic appeals onto the docket of the high court"). See also Hartung, The Limits of "Extraordinary Power": A Survey of First-Degree Murder Appeals under Massachusetts General Laws Chapter 278, Section 33E, 16 Suffolk J. Trial & App. Advoc. 1, 29 (2011); id. at 7-8 ("Given the expansive protections available to the defendant under Section 33E, the potential exists for a significant number of

Mass. 805, 824 (2017), cert. denied, 139 S. Ct. 54 (2017) (reducing conviction to murder in second degree where defendant was involved only in "remote outer fringes" of joint venture). Accordingly, we have reduced convictions only in the most compelling circumstances. See, e.g., Commonwealth v. Dowds, 483 Mass. 498, 512-513 (2019) (reducing conviction to murder in second degree where "uncommon facts" of defendant's two severe brain injuries were not presented to jury); Commonwealth v. King, 374 Mass. 501, 506-508 (1978) (reducing verdict where there was little evidence of deliberate premeditation and judge omitted critical instruction regarding voluntary intoxication).

iii. Gatekeeper. "Given the broad plenary review which capital defendants receive on direct appeal, there is a 'rational basis' for restricting their ability to appeal

---

first-degree murder convictions to be reduced or reversed. However, the results of [our survey] indicate the opposite conclusion"); Note, Populism and the Rule of Law: Rule 25 (b) (2) of the Massachusetts Rules of Criminal Procedure and the Historical Relationship Between Juries and Judges in the Commonwealth's Trial Courts, 34 Suffolk U.L. Rev. 125, 136 (2000) ("The SJC, indicating a respect for the deeply-rooted tradition of the right to trial by jury in Massachusetts, has rarely unleashed the extraordinary equitable power entrusted to it. The SJC, in an attempt to reassert its deference towards jury verdicts, instructed trial courts to use this same measure of restraint in the exercise of their verdict reformation authority"); Note, What Justice Requires: Equal Protection Clause Issues with the Massachusetts Supreme Court's 33E Powers, 52 Suffolk U.L. Rev. 319, 331 (2019) ("Despite having the power to reduce verdicts when it determines justice so requires, the SJC actually uses its verdict-reduction power quite rarely").

subsequent postconviction motions."  Dickerson, 396 Mass. at 744.  This restriction comes in the form of the "gatekeeper" provision of G. L. c. 278, § 33E, which requires that defendants convicted of murder in the first degree obtain leave from a single justice of the Supreme Judicial Court to appeal a postconviction motion after their direct appeal has been decided.[21]  Commonwealth v. Gunter, 459 Mass. 480, 487, cert. denied, 565 U.S. 868 (2011).  In order to obtain this additional review, a defendant must show that there is a "new and substantial" issue that this court could not have considered in the course of its plenary review in the direct appeal. Id., quoting G. L. c. 278, § 33E.  As detailed in Gunter, supra:

> "The bar for establishing that an issue is 'substantial' in the context of the gatekeeper provision of § 33E is not high. It must only be a meritorious issue in the sense of being worthy of consideration by an appellate court. . . . At the same time, an issue must also be 'new' to pass the gatekeeper's inspection.  This presents a more significant hurdle.  An issue is not 'new' within the meaning of G. L. c. 278, § 33E, where either it has already been addressed, or where it could have been addressed had the defendant properly raised it at trial or on direct review.  The statute requires that the defendant present all his claims of error at the earliest possible time, and failure to do so precludes relief on all grounds generally known and available at the time of trial or appeal" (citations and quotations omitted).

---

[21] The statute also designates that any motions for a new trial filed while the direct appeal is pending must be filed in this court.  G. L. c. 278, § 33E.

The ruling of a single justice, acting as a gatekeeper, that the application does not present a new and substantial question is final and unreviewable by the full court.  Leaster v. Commonwealth, 385 Mass. 547, 548-549 (1982).  A single justice of the Supreme Judicial Court is in the best position to conduct this review "[d]ue to [this court's] familiarity with the case." Dickerson, supra at 744.

iv.  Special considerations.  Finally, a defendant on direct appeal from a first-degree murder conviction is afforded other special considerations with regard to the filing of briefs, issue selection,[22] and time allotted for oral argument. Although an appellant's brief in a noncapital case is due forty days after the case is entered on the appellate court's docket, Mass. R. A. P. 19 (a) (1), as appearing in 481 Mass. 1642 (2019), an appellant in a first-degree murder appeal is allotted 120 days, Mass. R. A. P. 19 (c) (1).  Additionally, Mass. R. A. P. 22 (b), as appearing in 481 Mass. 1651 (2019), affords each

---

[22] "While the usual task of an appellate lawyer is to weed out the weak claims and brief only the stronger claims . . . this rule does not appear to apply in a first-degree murder appeal.  All colorable claims should be raised and briefed, keeping in mind the broad canvas of plenary review.  This does not, of course, mean giving equal attention to the strong and the weak.  It means that even a small issue, covering one page and tucked at the end of a section or on its own at the back of the brief, will receive the court's consideration and, given the stakes, should not be omitted."  Brandt & DeJuneas, supra at 15.3.2.

party an additional five minutes of oral argument (for a total of twenty minutes per side).

b.  The powers and provisions of § 33E review as applied to third convictions of habitual offenders under G. L. c. 279, § 25 (b).  In order to construct the bounds of § 33E review in the context of G. L. c. 279, § 25 (b), we must first determine whether every third conviction of a habitual offender is entitled to this unique review, or whether, as suggested by the history and evolution of § 33E, the Legislature intended to limit this review to only those convictions resulting in a mandatory life sentence -- i.e., those with the same punishment as a first-degree murder conviction.  We conclude it is the former.

"It is a well-established canon of construction that, where the statutory language is clear, the courts must impart to the language its plain and ordinary meaning" (emphasis added).  Commonwealth v. One 1987 Mercury Cougar Auto., 413 Mass. 534, 537 (1992). "The words of a statute are the main source from which we ascertain legislative purpose . . . ." Foss v. Commonwealth, 437 Mass. 584, 586 (2002).  "The language of a statute is not to be enlarged or limited by construction unless its object and plain meaning require it." Rambert v. Commonwealth, 389 Mass. 771, 773 (1983).  When the Legislature amended G. L. c. 278, § 33E, in 2012 to expand the definition of

"a capital case," it inserted the words "or (ii) the third conviction of a habitual offender under [G. L. c. 279, § 25 (b)]." We conclude that it is apparent from the plain meaning of this language that the Legislature intended for all of the enumerated offenses under G. L. c. 279, § 25 (b), to be included in this definition.

Although the habitual offender designation stems from a wide range of crimes as delineated in G. L. c. 279, § 25 (b), the statute provides that for any third conviction, a defendant must "be imprisoned . . . for the maximum term provided by law for the offense" of which the defendant has been presently convicted, and similar to the sentence for a first-degree murder conviction, is not eligible for parole.[23] The legislative history reveals that the struggle to present a "balanced bill" to the Governor resulted in attempts to "narrowly target[] a small class of violent habitual offenders[s]," and that in order to alleviate concerns about wrongful convictions, § 33E was amended as a "safety valve." State House News Service, House Session, July 30, 2012 (Statement of Rep. David P. Linsky).

---

[23] For example, the mandatory sentence for a defendant with two prior qualifying offenses who then commits attempted murder in violation of G. L. c. 265, § 16, is twenty years in State prison. But a defendant whose third conviction is for an assault and battery causing bodily injury in violation of G. L. c. 265, § 13A (b) (i), must be sentenced to a mandatory five years in State prison.

Therefore, because the plain meaning of and the legislative intent behind § 33E require it, all third convictions of habitual offenders under G. L. c. 279, § 25 (b), will be subject to the court's broad powers of plenary review. Accordingly, the Appeals Court will

> "consider the whole case, both the law and the evidence, to determine whether there has been any miscarriage of justice [and it will] consider questions raised by the defendant for the first time on appeal, or even . . . address issues not raised by the parties, but discovered as a result of [its] own independent review of the entire record" (citations omitted).

Dickerson, 396 Mass. at 744. This court's extensive history and case law describing the various standards of review pursuant to § 33E may serve as a guide.

With regard to the gatekeeper provision of § 33E, the statute mandates that the single justice review any application for leave to pursue a postconviction appeal to determine whether it presents a new and substantial question. G. L. c. 278, § 33E. Considering the extensive plenary review that the Appeals Court will conduct, the interest of judicial economy will be best served by maintaining a gatekeeping function. See Dickerson, 396 Mass. at 744. However, as the Appeals Court will be the court that is most familiar with the entire record, we again interpret the reference to a single justice of the "supreme judicial court" in § 33E, in conjunction with G. L.

c. 211A, § 10, to allow for these applications to be screened by a single justice of the Appeals Court.

The Appeals Court's ability to reduce the verdict of a third conviction of a habitual offender under § 33E presents a slightly more complicated question. The statutory language provides that the court may "order a new trial" or "direct the entry of a verdict of a lesser degree of guilt" and remand for resentencing if the court is (1) "satisfied that the verdict was against the law or the weight of the evidence," or (2) based on "newly discovered evidence," or (3) "for any other reason that justice may require." G. L. c. 278, § 33E. Given the varying nature of the crimes enumerated in G. L. c. 279, § 25 (b), we conclude that declaring a verdict of a "lesser degree of guilt" can mean two things in this context: the Appeals Court may uphold the verdict as it stands, but direct the Superior Court to impose another sentence less than the maximum term as otherwise required by § 25 (b); or the Appeals Court may reduce the verdict to a lesser included offense and direct the Superior Court to impose a new sentence consistent with the new verdict.[24]

---

[24] In this context, we also interpret "lesser degree of guilt" to allow the Appeals Court to vacate a sentence under G. L. c. 279, § 25 (b), and impose a sentence under § 25 (a). Although G. L. c. 279, § 25, is a sentencing enhancement statute, and therefore § 25 (a) cannot be a lesser included offense of § 25 (b), we recognize that there is a lower burden of proof for the Commonwealth under § 25 (a). Section 25 (a) encompasses a wider range of crimes (i.e., all felonies), and

Additionally, if the Appeals Court concludes that there was no injustice to be remedied on the present conviction, but there was a failure of proof on the habitual offender enhancement, it may vacate the sentence and remand the matter to the trial court for resentencing.

In sum, a defendant's direct appeal from a third conviction under the habitual offender statute, G. L. c. 279, § 25 (b), is to be entered directly in the Appeals Court, which will be required to complete § 33E review as described supra. In addition to having the power to order a new trial, the Appeals Court will have the authority to remand the case for resentencing. A single justice of the Appeals Court will act as a gatekeeper on postconviction motions after rescript.

However, in the interests of efficient administration of justice, "[w]e retain jurisdiction in the instant case and reach

---

under § 25 (a), "predicate convictions arising from separate qualifying criminal indictments or episodes need not [have been] separately prosecuted in order for a person to be considered a habitual criminal." Commonwealth v. Ruiz, 480 Mass. 683, 690 (2018). See id. at 688-689 (comparing with § 25 [a] with § 25 [b], which requires that prior charges have been separately brought and tried).

The Appeals Court may find that a mandatory maximum is still warranted, but that justice requires the availability of probation, parole, work release, or good conduct deductions, which are only available under § 25 (a). Therefore, the Appeals Court may, in certain circumstances, appropriately reduce a defendant's sentence by directing the trial court to resentence under G. L. c. 279, § 25 (a).

the defendant's claims." Commonwealth v. Balliro, 437 Mass. 163, 165 (2002).

4. Claims concerning the defendant's trial. a. Impermissible waiver of jury trial. The defendant argues that he was impermissibly allowed to waive his right to a jury trial on the sentencing enhancement provisions of the indictments.[25] He argues that this was in violation of G. L. c. 263, § 6, which expressly states that a defendant may not waive his right to a jury trial in a capital case. Since this court has already stated that "the §33E definition of 'capital case' governs the meaning of that phrase in c. 263, § 6," Commonwealth v. O'Brien, 371 Mass. 605, 606-607 (1976), he asserts that he was precluded from opting for a bench trial. The Commonwealth argues that the "third conviction" language contained in G. L. c. 278, § 33E, refers to the "underlying case on the third strike" and not the subsequent trial on the enhancement. According to the Commonwealth, the defendant was not precluded from waiving his right to a jury and being tried by a judge for the sentencing portion. We agree.

Although it is true that the definition of "capital case" in G. L. c. 278, § 33E, governs the meaning of "capital case" as

---

[25] The defendant was tried and convicted by a jury on the underlying crimes, but chose to waive his right to a jury during the subsequent sentencing enhancement trial.

it appears in G. L. c. 263, § 6, based on our holding in O'Brien, 371 Mass. at 606-607, § 33E defines a "capital case" to include "the third conviction of a habitual offender under [G. L. c. 279, § 25 (b)]."  This "third conviction" is referenced in the statute as a prerequisite to receiving an enhanced sentence as a habitual offender under G. L. c. 279, § 25 (b).  In other words, in order for a defendant to be sentenced as a habitual offender, there must be a conviction of one of the offenses enumerated by clause (i) of  G. L. c. 279, § 25 (b).  The Commonwealth must then prove that the defendant had been convicted twice previously of one of the offenses enumerated by clause (i), that the defendant was sentenced to incarceration at a State prison or State or Federal correctional facility for at least three years on each of the two prior convictions, and that the defendant had not been pardoned for either offense on the grounds that he or she was innocent. G. L. c. 279, § 25 (b).  This sentencing phase of a defendant's trial is separate and distinct from the trial for his or her third conviction.  See Commonwealth v. Richardson, 469 Mass. 248, 252 (2014) ("Statutes providing for enhanced sentencing based on a defendant's prior convictions do not create

independent crimes, but enhance the sentence for the underlying crime"[quotation and citations omitted]).[26]

As the Commonwealth argues, this is consistent with the rationale articulated in Commonwealth v. Francis, 450 Mass. 132, 135-136 (2007), S.C., 477 Mass. 582 (2017), in which the justification for the Legislature's desire to treat defendants facing a charge of murder in the first degree differently from other criminal defendants was explained. "The Legislature has determined that, when a defendant chooses to go to trial in such a case, the facts must be found by a jury rather than by 'one [person]'" (citation omitted). Id. at 136.

Therefore, where a defendant has been subject to an enhanced sentence as a habitual offender, he or she would not be entitled to waive his or her right to a jury trial on the indictment charging a crime that could lead to a third conviction pursuant to G. L. c. 263, § 6. However, a defendant

---

[26] The defendant argues that the Commonwealth invaded the province of the judiciary by filing a nolle prosequi on the habitual criminal portion of the indictments and seeking sentencing on the habitual offender portions. We have already detailed the procedure to be followed when a defendant is charged with multiple sentencing enhancement provisions applicable to a single underlying offense. See Commonwealth v. Richardson, 469 Mass. 248, 254-255 (2014). Additionally, the principle of the separation of powers requires that it be exclusively within the power of the executive branch to determine who and what crimes to prosecute. Because the Commonwealth appropriately filed a nolle prosequi prior to sentencing, we find no error.

is entitled to waive his or her right to a jury trial during the sentencing phase, especially given its technical nature, as long as the judge conducts a colloquy, advises the defendant of his or her constitutional right to a jury trial, and is satisfied that any waiver by the defendant, which must be memorialized in writing, is made voluntarily and intelligently.  See Ciummei v. Commonwealth, 378 Mass. 504, 509-510 (1979).

Here, after the verdict was announced, the judge asked defense counsel if the defendant had decided whether to proceed with a jury or a jury-waived trial for the sentencing enhancement portion.  Defense counsel requested time to discuss the issue with the defendant, after which the defendant appeared with counsel and informed the judge that it was his intention to waive a trial by jury.  The judge then conducted a colloquy with the defendant, reviewed the written waiver form with the defendant, which the defendant signed, and accepted the waiver as "made voluntarily, intelligently, and with knowledge of its consequences."  The waiver was valid.[27]

---

[27] The defendant also argues that in order to be sentenced as a habitual offender, he must have been previously convicted twice of the same offense for which he was just convicted.  This argument defies logic and the plain language of the statute.  We construe G. L. c. 279, § 25 (b), to mean that a person with three convictions of any combination of the enumerated offenses may be sentenced as a habitual offender, provided the other requirements of § 25 (b) are met.

b.  <u>Individual voir dire on interracial rape</u>.  The defendant, an African-American, filed a pretrial motion for individual voir dire on the grounds that this case involved allegations of interracial rape.  At the motion hearing, the judge acknowledged that the charge of interracial rape required individual questioning at sidebar, but he was uncertain as to "what question or questions are supposed to be asked."  The judge then suggested posing questions on a one-page questionnaire that would "supplement" what he asked.  In response, defense counsel stated that he used a questionnaire at another trial and "it actually worked pretty well, so I am not opposed to doing it"; he went on to say that it even "may be beneficial" as long as the jurors were brought into the court room individually.  The juror questionnaire included both general questions about racial prejudice and more specific questions, such as, "Would you tend to believe the testimony of a white person over that of a black person, or the testimony of a black person over that of a white person, based on the witnesses' race?" and

> "In this case, the defendant and the alleged victim are of
> different races:  the defendant is African-American, and
> the alleged victim is Caucasian.  Knowing that, would this
> fact interfere in any way with your ability to render a
> true and just verdict based solely on the evidence and the
> law?"

Defense counsel subsequently submitted his input on the questionnaire to the court and never raised the issue again during the three days of jury selection that included attorney-conducted individual voir dire.

On appeal, the defendant argues that a new trial is warranted because the judge failed to conduct an individual voir dire of the prospective jurors on the issue whether they could be impartial where the defendant is African-American and the victim is Caucasian. The Commonwealth acknowledges that a judge is required, on request, to question potential jurors individually in a case involving interracial rape, but asserts that the defendant's request here was waived when he agreed to pose certain questions by questionnaire. The Commonwealth further argues that even if the defendant's request was not waived, the defendant cannot show prejudice because the jurors were subject to individual voir dire and the evidence against the defendant was overwhelming.

In cases involving interracial rape, because of the "substantial risk that extraneous issues will influence the jury," individual questioning with respect to racial prejudice, on request, is mandatory. See Commonwealth v. Sanders, 383 Mass. 637, 640-641 (1981), overruled in part on another ground in Commonwealth v. Ramirez, 407 Mass. 553 (1980). The court in Sanders, supra, further explained:

"Although . . . interrogation of jurors as to racial prejudice is not constitutionally mandated . . . , we think it should be held in cases tried hereafter that as a matter of law interracial rape cases present a substantial risk that extraneous issues will influence the jury and hence are within [G. L. c. 234, § 28].[28]  Under the 1975 amendment, this means that prospective jurors are to be interrogated individually in accordance with the statute rather than as a group. . . .  The judge has broad discretion as to the questions to be asked, and need not put the specific questions proposed by the defendant. Commonwealth v. Walker, 379 Mass. 297, 300 (1979), and cases cited."

Here, defense counsel agreed to the judge's request to use a questionnaire as long as the jurors were brought individually into the court room, which they were.  Defense counsel had an opportunity to offer feedback on the questionnaire, which the judge incorporated.  He also was provided the opportunity to question the potential jurors himself, and he often declined to ask any questions at all.  Defense counsel therefore waived his request for the judge to individually question the jurors.

Further, the Commonwealth presented extensive evidence supporting a finding of the defendant's guilt, and the jurors fairly weighed the evidence against the defendant as reflected in their acquittal on two counts.  Therefore, "there appears no

---

[28] The statute is now G. L. c. 234A, § 67A, inserted by St. 2016, c.36, § 4, and provides that to determine "if it appears that, as a result of the impact of considerations which may cause a decision to be made in whole or in part upon issues extraneous to the case, . . . the juror may not stand indifferent, the court shall, or the parties or their attorneys may, . . . examine the juror specifically."

reason to believe that the jury improperly considered race in arriving at their findings."  Commonwealth v. Otsuki, 411 Mass. 218, 229 (1991).

c.  Jury instructions.  i.  Consciousness of guilt.  The defendant argues that the judge erred by allowing the Commonwealth to argue consciousness of guilt in its closing argument without providing the jurors with a consciousness of guilt instruction.  He claims that the instruction was mandatory and should have been given sua sponte.  The Commonwealth argues that the defendant was not entitled to a sua sponte instruction; the Commonwealth requested the instruction -- not the defendant -- and the defendant did not object to the judge's denial of this request.[29]

In Commonwealth v. Cruz, 416 Mass. 27, 30 (1993), this court held that when evidence is presented at a criminal trial tending to show the defendant's consciousness of guilt, the judge, on his or her own initiative, is required to instruct the

---

[29] The Commonwealth also claims it "ended up not arguing consciousness of guilt" in its closing, but the transcripts show otherwise:

> "And when the police arrived and the defendant realized it, he led [the victim], still naked, bleeding and blindfolded [toward the basement].  And when the police made themselves known in the basement, he fled out the back door, through the back yard, and into the neighborhood behind.  And he fought with the police when they caught up to him because he knew he was guilty."

jury in accordance with the instructions in Commonwealth v. Toney, 385 Mass. 575, 585 (1982). However, in Commonwealth v. Simmons, 419 Mass. 426, 435 (1995), we recognized that "[a] defense attorney . . . , as a matter of trial tactics, might not want to request a consciousness of guilt charge [because] it would not assist the defendant's case to have the judge focus the jury's attention on such matters." Therefore, we held that the decision to instruct on consciousness of guilt is "left to the sound discretion of the judge, and it will not be error if he or she chooses not to instruct on the subject in the absence of a request." Id. at 436.

Here, the defendant did not request a consciousness of guilt instruction in his written request for instructions, and he acknowledges that he did not object to the judge's denial of the Commonwealth's request. At this point in the trial, the defendant already had testified that he fled from the victim's boyfriend -- not the police, which was the Commonwealth's theory -- and the judge noted his desire to "remain neutral on that."[30] The judge's concern, that providing such an instruction could indicate that he agreed with the Commonwealth, is valid. Because the defendant did not request a consciousness of guilt

---

[30] During closing, defense counsel repeatedly emphasized that the defendant fled from the house to avoid a confrontation with the victim's boyfriend and then he coincidentally encountered the police.

instruction, and the judge properly exercised sound discretion, we find no error.

ii. Aggravated rape. The defendant argues that the aggravated rape instruction precluded the jury from determining whether an adequate nexus existed between the rape and the aggravating offenses because the judge instructed the jury that the aggravating offenses did not have to take place at the same exact time as the rape. Instead, the judge instructed the jury that the aggravating offenses and rape only had to take place during the "same criminal episode." Specifically, the defendant takes issue with a portion of the judge's instruction that "summarize[] this element":

> "So, if you find the defendant guilty of rape and also guilty on any one or more of the indictments that charge these offenses, that is, assault and battery by means of a dangerous weapon, assault by means of a dangerous weapon, kidnapping and/or breaking and entering in the daytime to commit a felony, then those findings together would constitute aggravated rape."

The defendant did not object to this instruction.

The statutory definition of aggravated rape requires, among other elements, forced sexual intercourse "during the commission or attempted commission of" one of the enumerated offenses. G. L. c. 265, § 22 (a). The judge's instructions given at the start of trial closely mirrored the statutory definition of

aggravated rape.[31]  During the jury charge, the judge clarified
and elaborated upon that instruction by explaining,

> "The word 'during' is a little bit misleading.  The statute
> says rape committed during certain offenses.  But the rape
> and the aggravated offense or offenses need not have
> occurred at exactly the same time.  The critical point is
> not whether the aggravating acts served to compel the
> complainant's submission, but whether she was subjected to
> other felonious conduct during the same criminal episode.
> So long as the rape and the other offense or offenses
> constituted one continuous episode in course of conduct and
> so long as the aggravated offense or offenses are on the
> list that I'm about to give you, they transform a rape into
> an aggravated rape, even if they didn't occur exactly
> simultaneously with the rape itself."

The judge then gave the now objected-to instruction followed by,

> "If the Commonwealth has proved the first element, sexual
> intercourse, and the second element, that is, by force and
> against her will, it has proved rape.  If it has proved the
> aggravating factor, that is -- if the Commonwealth has also
> proved the aggravating factor; that is, that the rape was
> committed during the same criminal episode as one of the
> enumerated crimes that qualify as aggravation, then it has
> proved aggravated rape."

We find no error in the judge's instruction.  In Commonwealth v.
McCourt, 438 Mass. 486, 496 (2003), we found that the jury were
"entitled to consider the entire sequence of events in making
their determination whether the aggravating acts occurred in the

---

[31] The judge instructed,

> "Aggravated rape is a more serious offense than rape, and
> it requires that the Commonwealth prove one additional
> element beyond a reasonable doubt.  In order to prove
> somebody guilty of aggravated rape, the Commonwealth needs
> to prove beyond a reasonable doubt that the rape . . . was
> committed during the commission or attempted commission of
> certain offenses."

course of the rape" or whether they should be viewed as separate offenses. Here, the judge's instructions did just that. First, he explained to the jury how they could determine whether the aggravating offenses occurred "during" the rape, then he reiterated what the aggravating offenses were, and he concluded by reminding the jury that it was the Commonwealth's burden to prove that the rape was committed "during" the same criminal episode.

    d. <u>Dismissal of juror without extraneous influence inquiry</u>. Before closing arguments, a juror sent a note to the judge that read, "I wanted you to know yesterday [the defendant's] sister was on the bus with me and she said a few thing[<u>s</u>]." The judge conducted a voir dire of the juror, and the juror explained that the previous day she had unknowingly spoken with the defendant's sister while waiting for the bus. Once on the bus, the two sat next to each other and the defendant's sister discussed various aspects of the case, including that she had not provided the defendant with the victim's telephone number[32] and that the defendant was mistreated by the police and hospitalized for three days after the

---

    [32] This is significant because the defendant claimed that the victim had given him her telephone number as part of their consensual sexual relationship, while the Commonwealth suggested that the defendant had obtained her telephone number from his sister.

encounter.  When the judge inquired whether this juror had discussed this conversation with any other jurors, she confidently stated that she had not.[33]  The judge excused the juror.  In denying defense counsel's motion for a mistrial, the judge stated that the juror "came across as very candid, and she was quite emphatic" that she had not spoken with other jurors.

The defendant argues that the judge erred in failing to determine the extent of an extraneous influence on the jury when this juror was discharged, especially because the defendant's sister and the juror spoke "at length" about the case.  The Commonwealth argues that there was no abuse of discretion where the lone juror credibly reported that she had not discussed the matter with anyone else on the jury and where she was subsequently excused.

We have recently described the bounds of judicial discretion as it pertains to the impartiality of remaining jurors:

> "A trial judge 'has discretion in addressing issues of extraneous influence on jurors discovered during trial.' . . . Because the determination of a juror's impartiality is essentially one of credibility, and therefore largely one of demeanor, [a reviewing court] . . . 'will not disturb a judge's findings of impartiality,' or a judge's finding that a juror is unbiased, 'absent a clear showing of an abuse of discretion

---

[33] The judge inquired a second time, "You're sure about that?"  To which she replied, "Of course I am.  One hundred percent."

or that the finding was clearly erroneous'" (citations omitted).

Commonwealth v. Colon, 482 Mass. 162, 168 (2019).

In Commonwealth v. Amran, 471 Mass. 354, 362-363 (2015), a juror accidentally was exposed to extraneous material. The defendant argued that the judge erred by failing to conduct a voir dire of the remaining jurors after one had been exposed. Id. at 363. In concluding that the judge had not abused his discretion, the court noted that the judge was entitled to rely on the answers of the foreperson and the juror interviewed. Id. at 364. No additional voir dire was required. Id. Because this case is dispositive on the issue, we find no abuse of discretion.

5. Relief pursuant to G. L. c. 278, § 33E. Having carefully reviewed the entire record, we discern no reason to exercise our power under § 33E to set aside the verdict or remand this case for resentencing.

Judgment affirmed.